# Illinois Official Reports

## Appellate Court

---

**People v. Thomas, 2014 IL App (2d) 121001**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARQUIS THOMAS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-1001 |
| Filed<br>Rehearing denied | September 26, 2014<br>October 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The summary dismissal of defendant's *pro se* postconviction petition alleging that his appellate counsel was ineffective in failing to allege on direct appeal from his conviction for first-degree murder that his trial counsel was ineffective in dealing with evidence that an incarcerated minor confessed to a jail chaplain and detectives was reversed and the cause was remanded for further proceedings, notwithstanding the trial court's finding that the petition was frivolous and patently without merit, since defendant did not forfeit his arguments and the petition stated the gist of a constitutional claim, especially in view of the potentially meritorious claim for a new trial based on the exclusion of a jail chaplain's testimony concerning the minor's confession and the chaplain's indication that despite the clergy-penitent privilege, there was nothing in the rules of his church that prevented him from disclosing the minor's statement. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 07-CF-1702; the Hon. John R. Truitt, Judge, presiding. |
| Judgment | Reversed and remanded; mittimus modified. |

Counsel on Appeal    Alan D. Goldberg and Rachel Moran, both of State Appellate Defender's Office, of Chicago, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel    PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Schostok and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury found defendant, Marquis D. Thomas, guilty of the first-degree murder of Lavontaye Nunn. See 720 ILCS 5/9-1(a)(1) (West 2006). The trial court sentenced defendant to 30 years' imprisonment with a 25-year handgun "add-on" penalty, resulting in a 55-year aggregate term. On direct appeal, defendant argued, *inter alia*, that the trial court erred by excluding the statement "I did it" uttered to detectives by N.H., an incarcerated minor. N.H. had recanted the statement in a video-recorded interview. We affirmed the judgment, holding that the trial court did not abuse its discretion by excluding the statement as unreliable, in part because it was not corroborated by other evidence. *People v. Thomas*, 2011 IL App (2d) 091061-U, ¶ 56.

¶ 2    Defendant filed a *pro se* postconviction petition in which he alleged that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. The petition reiterated that N.H. confessed to the detectives, asserted that N.H. also confessed to a jail chaplain, and argued that trial counsel should have taken additional steps to ensure that the confession was admitted.

¶ 3    The postconviction court summarily dismissed the petition as frivolous and patently without merit. The court concluded that appellate counsel was not ineffective for failing to allege trial counsel's ineffectiveness in handling the evidence, because trial counsel, in fact, had raised, argued, and preserved for direct appeal the admissibility of N.H.'s statement to the detectives. On appeal, defendant frames the underlying issue differently, arguing that appellate counsel was ineffective for failing to argue that the *trial court* erred in excluding N.H.'s conversations with the chaplain and for failing to argue that the chaplain's testimony would have corroborated N.H.'s statement to the detectives.

¶ 4    The State responds that defendant has forfeited his present arguments because the postconviction petition focuses on N.H.'s statement to the detectives, not to the chaplain, and attributes the error to trial counsel, not the trial court. The State echoes the postconviction

court's conclusion that, because trial counsel raised, argued, and preserved the issue, he was not ineffective. The State alternatively contends that, if we choose to address defendant's present arguments regarding N.H.'s statements to the chaplain and the detectives, the petition does not state the gist of a constitutional claim, because the chaplain's disclosure was correctly barred under the clergy-penitent privilege.

¶ 5 The forfeiture issue is a close one, but the standard of review for a first-stage dismissal is *de novo*, and we have a duty to construe *pro se* postconviction petitions liberally and to allow borderline petitions to proceed. Defendant's petition and appellate brief both argue that counsel on direct appeal mishandled the admissibility of N.H.'s alleged confessions to the detectives and the chaplain, and the record and the law potentially support that assertion. Therefore, we conclude that defendant has not forfeited his present appellate arguments and that the petition states the gist of a constitutional claim. We reverse the summary dismissal of the petition and remand the cause for further postconviction proceedings. We also modify the mittimus to reflect an additional credit for defendant's time spent in presentence custody.

¶ 6                                    I. BACKGROUND
¶ 7                                    A. Evidence at Trial
¶ 8 The shooting occurred on the central walkway of a courtyard on the 1500 block of Birch Court in Rockford. The block has two long rectangular apartment buildings that run north and south and are separated by a grassy central courtyard. The central walkway runs north and south through the middle of the courtyard. To the west of the west building is Garden Court and to the east of the east building is Birch Court. The area is bordered on the north by Buckbee Street and on the south by 15th Avenue.

¶ 9 On the evening of April 3, 2007, Lavontaye and Eva Pennie were talking on the central walkway near 1504 Birch Court when a man walked up to them and began shooting. A bullet grazed Eva's face, and Lavontaye was hit several times. Lavontaye crawled south a short distance to where his body was found on the sidewalk between 1511 Birch Court, which is in the west building, and 1510 Birch Court, which is in the east building.

¶ 10 On the night of the shooting, Minishia Harris lived at 1510 Birch Court. At 9:15 p.m., she heard shooting and looked out her front window. Minishia was 10 to 15 feet from the scene and saw "a boy crawling, and [she saw] someone standing over him shooting." The shooter was wearing a black hoodie sweatshirt, and the hood fell down so Minishia could see his face. Minishia identified defendant in court as the offender. Minishia saw defendant run west toward Garden Court and enter a car that drove north on Garden Court toward Buckbee Street. Minishia heard the noise from a car that she identified as belonging to "Fo' Pumpkin." Minishia called 911. Minishia previously had seen defendant hanging around with Fo' Pumpkin.

¶ 11 Minishia testified that she saw the police chasing defendant and Tommie Moore through the projects on April 29, 2007, and that she saw the police arrest them. Later that day, Minishia called the police and told them that they had arrested the person who had shot Lavontaye.

¶ 12 Rockford police officer Michelle Bootz testified that she was on patrol at the Blackhawk Projects on the evening of April 29, 2007, when she arrested N.H. and Tommie Moore.

Officer Bootz testified that another officer arrested defendant and brought him to where N.H. and Moore were in custody and awaiting transport to the police station.

¶ 13    Nikita Bernel-Hill testified that, on the night of the shooting, she lived at 1407 Birch Court, which was north of the crime scene. Nikita heard gunshots, went to her children's room, looked out the window, and saw defendant run past. Defendant was about 10 to 15 feet away when Nikita saw him. Defendant was wearing a black hoodie and had a gun in his waistband. Defendant bent down to pick a telephone off the ground. Nikita saw defendant run east toward Birch Court and get into Fo' Pumpkin's car, which drove south on Birch Court toward 15th Avenue. Nikita testified that, though she was not sure, it looked like Tommie Moore, who was also known as "Trapper," was driving the car. Nikita called the police and told them that she heard shots, but she also told them not to come to her house, because she feared the people in the Blackhawk Projects.

¶ 14    Eva testified that she lived at the Blackhawk Projects on the date of the shooting. Eva was standing on the sidewalk with Lavontaye, whom she knew as "Face." Someone ran up and shot Lavontaye repeatedly, and Eva ran west toward Sun Court Street and looked back. Eva did not identify defendant in court as the shooter. Eva did not speak with the police on the night of the shooting, because she was scared, but she spoke with them the next day. Eva admitted that she had omitted certain information from her statement that day, because she was scared.

¶ 15    Detective Eric Harris testified that he spoke with Eva on May 16, 2007, regarding the shooting. Detective Harris created a photographic lineup and showed it to Eva, who identified defendant as the person who shot and killed Lavontaye. Eva also gave Detective Harris a written statement in which she identified defendant as the person who shot the victim and whom she identified in the photographic lineup.

¶ 16    Eva testified that she remembered giving the police another statement on May 16, 2007, and she said that the statement was truthful. Eva admitted that she told the police that she saw who shot Lavontaye, but she testified that she was not sure who shot Lavontaye and that she could not remember who she said had shot him. Eva also testified that she remembered being shown photographs and identifying someone, but she did not remember that the person she identified was defendant.

¶ 17    Eva acknowledged that, in August 2008, she had talked with an assistant State's Attorney and a detective, telling them that she was afraid for her life and had been beaten and told to keep her mouth shut about the murder. Eva identified the written statement that she had given the police and testified that the statement was truthful. Despite that, she again testified that she did not see in court the person who shot Lavontaye.

¶ 18    Defendant presented an alibi defense through the testimony of Kimberly Keys as well as the security videotape from the emergency room of SwedishAmerican Hospital. Defendant's theory at trial was that he could not have committed the murder, because he was at the hospital attempting to visit a friend around the time of the shooting. He also argued that the videotape showed that he was wearing different clothing than the offender. The parties stipulated to the authenticity of the videotape, and the trial court admitted it into evidence and played it for the jury. Kimberly testified that the videotape showed her, defendant, and another couple in the emergency room lobby.

B. N.H.'s Statement to Detectives

¶ 20    Before trial, defendant moved to admit the statement of N.H., who blurted "I did it" while talking with Detective Harris at the police station about one month after the shooting. The trial court excluded the statement, and counsel on direct appeal argued that the exclusion was an abuse of discretion entitling defendant to a new trial.

¶ 21    On April 29, 2007, defendant, Tommie Moore, and N.H. were arrested at the Blackhawk Projects. N.H. was arrested for criminal trespass and resisting arrest. On May 7, 2007, Detectives Harris and Posley transported N.H. from the juvenile detention center to an interview room at the Rockford police station. Detective Harris informed N.H. of his *Miranda* rights, and N.H. said that he understood his rights. Detective Harris told N.H. that the police "had some information about a murder that [N.H.] was possibly involved in and they wanted to ask him about it." N.H. said "I did it." N.H. did not explain what he meant or provide any other information at that time. Because the police ordinarily video-record the questioning of murder suspects, Detectives Harris and Posley stopped the interview, stepped out of the room, and left N.H. inside.

¶ 22    When the interview resumed more than two hours later, Detective Simon Solis monitored and video-recorded it. N.H. recanted and tried to explain why he falsely said that he "did it." Six times N.H. said that he did not know why he said he "did it." N.H. also explained that defendant had a motive to kill Lavontaye: as retaliation for the shooting of Marcellus Motton a few weeks before Lavontaye's murder. The trial court excluded the videotape, N.H.'s statement "I did it," and the detectives' testimony about the interview.

¶ 23    C. N.H.'s Statements to Chaplain Fricks

¶ 24    On November 13, 2008, defense counsel filed a motion *in limine* to compel the testimony of Chaplain Wayne Fricks regarding the murder of Lavontaye. The motion alleged that the public defender's investigator, Robert Faulkner, interviewed Chaplain Fricks and that the State was provided details of the interview. Chaplain Fricks freely and voluntarily disclosed to Faulkner N.H.'s statements in which he confessed to the murder of Lavontaye. Chaplain Fricks freely and voluntarily disclosed that he then told defendant about N.H.'s confession. Counsel argued that N.H.'s statements were admissible because (1) the statements were against N.H.'s penal interest and (2) Chaplain Fricks waived his side of the clergy-penitent privilege by disclosing N.H.'s statements.

¶ 25    On November 25, 2008, the court began hearing the motion to admit Chaplain Fricks' testimony. Chaplain Fricks testified that he was an ordained Pentecostal minister and employed by the Rockford Reachout Jail Ministry. Chaplain Fricks' job was to conduct Bible studies at both the juvenile detention center and the main jail. In 2007, Chaplain Fricks met several times with N.H., who was an inmate at the detention center and had signed up for one-on-one meetings with a chaplain.

¶ 26    When asked whether "the rules of the Pentecostal church" enjoined him from disclosing a confession made during the course of his work, Chaplain Fricks said that it was "really up to [his] own *** choosing." Chaplain Fricks explained that he was allowed to disclose the information if he believed it necessary to do so. He testified that nothing in his religious affiliation prevented him from telling other people something that was said to him in

confidence, and he had no objection whatsoever to testifying about the things N.H. had told him.

¶ 27    Chaplain Fricks testified that, at their first meeting, N.H. told him that he had done a lot of bad things and felt tormented by his past. Chaplain Fricks told N.H. that he could "express himself" if he wanted. N.H. responded that, as part of an altercation between his group and another group, N.H. had shot and killed someone in the Blackhawk Projects. N.H. told Chaplain Fricks "that he had shot somebody and that *** the guy that he shot [had] died." N.H. said that it was tormenting him and that he did not know "what to do with it." N.H. mentioned that a man named Blackie was charged with the crime. Chaplain Fricks described N.H. as "very sincere." The chaplain advised N.H. to "notify the authorities that [he had] done this."

¶ 28    Soon after the meeting with N.H., Chaplain Fricks met with defendant, who was charged with Lavontaye's murder and in jail. Defendant claimed innocence and told Chaplain Fricks that the real shooter was a boy named Marcus. Chaplain Fricks knew that N.H.'s middle name was Marcus. When the meeting began, Chaplain Fricks did not know that defendant and N.H. were connected in any way, but as defendant described the incident, Chaplain Fricks realized that defendant was talking about N.H. Identifying N.H. by first name, Chaplain Fricks asked whether he was the shooter, and defendant responded, "Yeah, that's him."

¶ 29    About one week after their first meeting, Chaplain Fricks told N.H. that he had spoken with defendant. N.H. responded that he had tried to redeem himself by telling the detectives about the incident, but that the detectives did not believe him.

¶ 30    Chaplain Fricks explained that, because the lives of defendant and N.H. were "intertwined" and he was in the middle, he believed that he could tell each about conversations he had with the other. Chaplain Fricks told defendant, Faulkner, and the attorneys about N.H.'s confession. Chaplain Fricks also was aware that N.H. had confessed to the detectives after their initial conversation.

¶ 31    The hearing resumed on October 29, 2009, at which time Michael Raridon, an attorney appearing on N.H.'s behalf, asserted the clergy-penitent privilege and moved to strike Chaplain Fricks' testimony about his conversations with N.H. N.H. did not testify, Raridon offered no other evidence in support of the privilege, and the parties proceeded directly to argument.

¶ 32    Defense counsel asserted that, once Chaplain Fricks indicated a willingness to testify, the burden shifted to N.H. to show that the testimony about his statements would violate the rules of Chaplain Fricks' religion. Counsel further argued that N.H. waived any potential clergy-penitent privilege by speaking to the detectives. Raridon countered that any person who holds himself out to be a spiritual counselor, like Chaplain Fricks, owes a "universal" duty to maintain confidentiality and invoke the privilege on behalf of the penitent.

¶ 33    The trial court agreed with defense counsel that the burden had shifted to N.H. to show that Chaplain Fricks' disclosure was prohibited by the rules of his religion, and the State admitted that Chaplain Fricks already had testified that it was not. Nevertheless, the court found that, because Chaplain Fricks was working as a chaplain when he took N.H.'s confession, N.H. presumably expected his conversation to be private. Based on a presumed expectation of privacy, the court barred any evidence about N.H.'s statements to Chaplain Fricks.

¶ 34    The court found absurd the notion that a person seeking spiritual counseling must first ask a clergyman about the confidentiality rules of his religion before admitting or confessing to criminal acts as part of the counseling. The court also rejected defense counsel's contention that N.H. waived the privilege when he spoke to detectives about the incident.

¶ 35    On September 2, 2009, following defendant's conviction, defense counsel filed an amended motion for a new trial, arguing, *inter alia*, that the trial court erred in excluding N.H.'s statements to Chaplain Fricks. The motion challenged the court's conclusion that there could be no further inquiry into N.H.'s statements to Chaplain Fricks once N.H. claimed the clergy-penitent privilege. The State responded that "[N.H.] was not even called as a witness, which would be a precursor to attempting to use his statements as substantive evidence." The court denied the posttrial motion.

¶ 36                              D. Direct Appeal

¶ 37    On direct appeal, defendant argued that (1) he was not proved guilty beyond a reasonable doubt, because he did not match the description of the offender; (2) the trial court abused its discretion in declining to give the jury the videotape that purportedly showed defendant at the hospital around the time of the offense; (3) the court erred in refusing to suppress the testimony of the three eyewitnesses who identified defendant as the offender; (4) the court erred by excluding N.H.'s statement to the detectives; and (5) the court erred by refusing to instruct the jury regarding the bias of a witness who had been arrested and charged with an unrelated offense.

¶ 38    Defendant argued, *inter alia*, that N.H.'s hearsay statement, "I did it," which he made to the detectives, was admissible as a sufficiently trustworthy statement made against the declarant's penal interest. We observed that the trial court considered the relevant factors in determining whether N.H.'s out-of-court statement against penal interest was sufficiently trustworthy: (1) whether the statement was made spontaneously to a close acquaintance shortly after the crime had occurred; (2) whether the statement was corroborated by other evidence; (3) whether the statement was self-incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity to cross-examine the declarant. *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973). In excluding the statement to the detectives, the trial court emphasized that "what we have is simply a statement by [N.H.] 'I did it.' Nothing more." The court found that, though the statement was spontaneous, it was not made shortly after the crime, which had occurred one month earlier, and it was made to the detectives rather than to a close acquaintance. The court found that, though there was some evidence that N.H. was aware of information that could be known only by someone around the crime scene, N.H.'s statement was not corroborated by other evidence. The videotape of the interview appeared to show that N.H. admitted his role to "give an all clear signal" to defendant, take the gun from defendant after the shooting, and hand it off to Trapper as defendant ran to the getaway car.

¶ 39    Noting that the video-recorded portion of N.H.'s interview was missing from the appellate record, which limited our review, we concluded that the trial court did not abuse its discretion in excluding N.H.'s statement to the detectives. We agreed with the trial court that N.H.'s statement was not corroborated. *Thomas*, 2011 IL App (2d) 091061-U, ¶ 56. On direct appeal, counsel did not challenge the exclusion of N.H.'s statements to Chaplain Fricks or

argue that the chaplain's testimony would have provided the necessary corroboration for N.H.'s statement to the detectives.

¶ 40                                                E. Postconviction Petition

¶ 41        On July 30, 2012, defendant filed a *pro se* postconviction petition alleging that appellate counsel was ineffective for failing to allege trial counsel's ineffectiveness. Among other things, the petition claims that appellate counsel should have argued that trial counsel was ineffective for inadequately investigating and presenting certain evidence that N.H. confessed to the offense. The postconviction court summarily dismissed the petition as frivolous and patently without merit, and this timely appeal followed.

¶ 42                                                II. ANALYSIS
¶ 43                                        A. Post-Conviction Hearing Act

¶ 44        On appeal, defendant argues that his claim regarding N.H.'s alleged confessions supports reversing the summary dismissal of his petition and remanding the cause for further postconviction proceedings. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a mechanism by which a criminal defendant can assert that his conviction and sentence were the result of a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2012). A postconviction proceeding is not an appeal from the judgment of conviction, but is a collateral attack on the trial court proceedings. *People v. English*, 2013 IL 112890, ¶ 21. To be entitled to postconviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged judgment. *English*, 2013 IL 112890, ¶ 21.

¶ 45        The purpose of a postconviction proceeding is to permit inquiry into constitutional issues that were not, and could not have been, adjudicated previously on direct appeal. *English*, 2013 IL 112890, ¶ 22. Issues that were raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *English*, 2013 IL 112890, ¶ 22. However, the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *English*, 2013 IL 112890, ¶ 22.

¶ 46        The Act provides a three-stage process for adjudicating postconviction petitions. *English*, 2013 IL 112890, ¶ 23. At the first stage, a trial court considers whether the postconviction petition is frivolous or patently without merit. *People v. Andrews*, 403 Ill. App. 3d 654, 658-59 (2010). If the postconviction petition survives the first-stage review, it proceeds to the second stage and is docketed "for further consideration in accordance with Sections 122-4 through 122-6." 725 ILCS 5/122-2.1(b) (West 2012). At the second stage, counsel is appointed and the *pro se* petition may be amended. *Andrews*, 403 Ill. App. 3d at 658. In addition, the State may answer the petition or seek its dismissal. 725 ILCS 5/122-5 (West 2012). The proceedings advance to the third stage if the State answers the petition or the court denies the State's motion to dismiss. At the third stage, the postconviction petitioner may submit evidence supporting his claim. *Andrews*, 403 Ill. App. 3d at 658-59; see 725 ILCS 5/122-6 (West 2012).

¶ 47        In this case, the trial court dismissed the petition at the first stage, concluding that defendant's claim is frivolous and patently without merit. At the first stage in the postconviction process, the trial court reviews the defendant's petition on its own, without input from the parties. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). During this stage, the trial court may review the court file, the transcripts, and any appellate court actions. *Brown*, 236 Ill. 2d at 184. At this stage, the court treats allegations of fact as true so long as those allegations are not affirmatively rebutted by the record. *People v. Bethel*, 2012 IL App (5th) 100330, ¶ 10. Any petition deemed frivolous or patently without merit must be dismissed. 725 ILCS 5/122-2.1(a)(2) (West 2012). A petition is frivolous or patently without merit where it has no arguable basis either in law or in fact in that it is based on an indisputably meritless legal theory or fanciful factual allegations. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). An example of an indisputably meritless legal theory is one that is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations include those that are fantastic or delusional. *Brown*, 236 Ill. 2d at 185.

¶ 48        A *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim. *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32. Petitions filed *pro se* must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed. Because a *pro se* petitioner will likely be unaware of the precise legal basis for his claim, the threshold for survivrfed4.o;pal is low, and a *pro se* petitioner need allege only enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act. *Mars*, 2012 IL App (2d) 110695, ¶ 32 (citing *Hodges*, 234 Ill. 2d at 9). "However low the threshold, the petition must 'clearly set forth' the respects in which the petitioner's constitutional rights were violated. (Internal quotation marks omitted.)" *Mars*, 2012 IL App (2d) 110695, ¶ 32 (quoting *Hodges*, 234 Ill. 2d at 9). This means that the pleading must bear some relationship to the issue raised on appeal. *Mars*, 2012 IL App (2d) 110695, ¶ 32. Liberal construction does not mean that we distort reality. *Mars*, 2012 IL App (2d) 110695, ¶ 32. We review *de novo* the dismissal of a postconviction petition at the first stage. *People v. Coleman*, 183 Ill. 2d 366, 387-88 (1998).

¶ 49                              B. Ineffective Assistance of Counsel

¶ 50        Defendant's postconviction claim is based on the alleged ineffectiveness of counsel on direct appeal and at trial. Both the United States and Illinois Constitutions guarantee a defendant the right to effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The purpose of this guarantee is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *People v. Pineda*, 373 Ill. App. 3d 113, 117 (2007). The ultimate focus of the inquiry is on the fundamental fairness of the challenged proceedings. *Strickland*, 466 U.S. at 696; *Pineda*, 373 Ill. App. 3d at 117. "However, there is a strong presumption of outcome reliability, so to prevail, a defendant must show that counsel's conduct 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Pineda*, 373 Ill. App. 3d at 117 (quoting *Strickland*, 466 U.S. at 686).

¶ 51        Claims of ineffective assistance of counsel are generally evaluated under the two-part test set forth in *Strickland*, 466 U.S. at 687, and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). *People v. Harris*, 225 Ill. 2d 1, 20 (2007). Under *Strickland*, defense counsel was ineffective only if (1) counsel's performance fell below an

objective standard of reasonableness; and (2) counsel's error prejudiced the defendant. Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 687; *Pineda*, 373 Ill. App. 3d at 117.

¶ 52     We assess counsel's performance by using an objective standard of competence under prevailing professional norms. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *Ramsey*, 239 Ill. 2d at 433. As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable. *Ramsey*, 239 Ill. 2d at 433. The prejudice prong of the *Strickland* test can be satisfied if the defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). In the context of a first-stage postconviction claim, a defendant need show only that he can arguably meet those two standards, *i.e.*, it is arguable that his counsel was deficient and it is arguable that the outcome of his case would have been different absent the deficient representation. *Hodges*, 234 Ill. 2d at 17.

¶ 53     Defendant's *pro se* postconviction petition contains a claim with the following heading: "Petitioner was denied his sixth amendment right to effective assistance of appellate counsel where he failed to raise as error on appeal trial counsel's failure to investigate and present available facts and evidence that [N.H.] confessed to committing the murder at bar." In support of this conclusion, the claim alleges the following facts:

> "The court suppressed the tape [of N.H. recanting the statement 'I did it' made to the detectives], N.H.'s statement ['I did it'], and the police witnesses' testimony about either interview [citation], over the defense request to introduce evidence of the first interview to the jury. [Citation.] *Further, conversations with the jail pastor, Mr. Fricks, wherein Mr. N.H. confessed to the murder, also were suppressed.*
>
> * * *
>
> In this case further investigation was imperative. As was admitted at the trial by Det. Harris, who testified that Mr. N.H. stated 'I did it' when asked about the murder at bar. Trial counsel had an affirmative obligation to conduct an inquiry where facts, accessible to him by the exercise of minimal diligence, would raise genuine questions about the defendant [*sic*] innocence. By *failing to take any steps to corroborate Mr. N.H. [sic] statement 'I did it,'* trial counsel's performance was beyond credible dispute that the State's case presented against the defendant was not subjected to the 'adversarial testing' required by *Strickland*.
>
> Had appellate counsel on direct appeal raised as error trial counsel's ineffectiveness for failure to investigate Mr. N.H.'s statement 'I did it,' *there is a reasonable probability that, had Mr. N.H. [sic] statement been corroborated by other evidence, the result of the proceedings would have been different.*" (Emphases added.)

¶ 54     To the petition, defendant attached an affidavit in which he stated that "[o]n November 25, 2008, pastor Wayne Fricks testified that [N.H.] told him that he had shot someone in the Blackhawk Housing Project, and that the guy had died." Defendant also attached a transcript of Chaplain Fricks' testimony from the hearing.

## C. Forfeiture

On appeal, defendant makes two arguments that the petition states the gist of a constitutional claim and therefore should proceed to the second stage of postconviction proceedings. First, defendant argues that "the trial court was wrong when it ruled that [N.H.'s] confession was barred by the clergy-penitent privilege, and appellate counsel was ineffective when he failed to raise this fully-preserved issue on direct appeal." Second, in a related argument, defendant asserts that appellate counsel "erred in failing to argue that [N.H.'s] confession to Fricks provided sufficient corroboration for admission of [N.H.'s] subsequent confession to detectives as a statement against penal interest."

The State argues that defendant's appellate arguments are forfeited because they "differ[ ] substantially" from the *pro se* postconviction petition. See 725 ILCS 5/122-3 (West 2012) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.").

The State concedes that defendant's appellate arguments and the petition each claim ineffective assistance of appellate counsel based on alleged errors related to the exclusion of N.H.'s statements. However, the State points out that defendant's appellate arguments and the petition diverge regarding (1) to whom N.H. confessed and (2) who is at fault for the allegedly erroneous exclusion of the confession. On appeal, defendant attributes the error to the trial court for excluding N.H.'s confession to Chaplain Fricks. The petition attributes the error to trial counsel for failing to do more to corroborate N.H.'s confession to the detectives.

The State concludes that defendant has forfeited the arguments articulated in this appeal because the petition does not claim that (1) appellate counsel was ineffective for failing to argue that the *trial court* erred in barring N.H.'s statements to *Chaplain Fricks* or (2) appellate counsel was ineffective for failing to argue that N.H.'s statements to Chaplain Fricks would have corroborated the subsequent incriminating statement to the police. According to the State, equating the petition's claim of ineffective assistance of appellate counsel with a "completely different" claim of ineffective assistance of appellate counsel would exceed the liberal construction afforded *pro se* postconviction petitions. The State essentially argues that we should disregard defendant's appellate arguments regarding N.H.'s alleged confession because the petition contains *too much* detail regarding to whom the statements were made and who is allegedly at fault for their exclusion.

A *pro se* petition should not be construed so strictly during the first stage of postconviction proceedings. The supreme court has held that, to survive summary dismissal, a *pro se* postconviction petitioner is not required to allege facts supporting all elements of a constitutional claim. *Brown*, 236 Ill. 2d at 188. In *Hodges*, the supreme court expressed concern that *pro se* petitions should be given a liberal construction and should be reviewed " 'with a lenient eye, allowing borderline cases to proceed.' " *Hodges*, 234 Ill. 2d at 21 (quoting *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983)). "While in a given case the *pro se* defendant may be aware of all the facts pertaining to his claim, he will, in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim." *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). It is for this reason that a *pro se* defendant is required to present only the "gist" of a constitutional claim, which is "something less than a completely pled or fully stated claim." *Edwards*, 197 Ill. 2d at 245.

In the heading of the claim, the petition does not distinguish between N.H.'s statements to the detectives and to Chaplain Fricks. The petition alleges that the trial court wrongly

excluded the following evidence of N.H.'s confession: (1) the video-recording of N.H.'s interview with the detectives, (2) N.H.'s statement to the detectives, "I did it," (3) the detectives' testimony about the interview, and (4) N.H's confession to Chaplain Fricks. To the petition, defendant attached his affidavit, which refers to the hearing on Chaplain Fricks' testimony. Defendant also attached a transcript from that hearing, where Chaplain Fricks identified Lavontaye as the victim and described specific inculpatory statements by N.H. The petition concludes that there is a reasonable probability that, had the statement "I did it" been corroborated by other evidence, the result of the proceedings would have been different.

¶ 62    A liberal construction of the *pro se* petition, defendant's affidavit, and the record shows that the petition alleges that (1) appellate counsel was ineffective for omissions on direct appeal, (2) trial counsel failed to take the proper steps to corroborate N.H.'s statement "I did it," (3) Chaplain Fricks would have testified at trial that N.H. confessed, (4) the trial court excluded N.H.'s separate statements to the detectives and to Chaplain Fricks, and (5) N.H.'s statement to the detectives would have been admitted upon proper corroboration. The logical conclusion to be drawn from these allegations is what defendant argues in this appeal: Chaplain Fricks' testimony is the "other evidence" that should have been admitted to corroborate N.H.'s statement to the detectives.

¶ 63    Therefore, we reject the State's forfeiture argument and conclude that the petition states the gist of a constitutional claim to survive the first stage of postconviction proceedings. The petition sufficiently alleges that counsel on direct appeal was ineffective for failing to argue that N.H's statements to the detectives and to Chaplain Fricks corroborated each other and should have been admitted. After linking N.H.'s statements to the detectives and to Chaplain Fricks, the petition asserts that N.H.'s alleged confession should have been admitted and that appellate counsel and trial counsel were ineffective for failing to do more to achieve that result. If counsel on direct appeal had argued that Chaplain Fricks' testimony was erroneously excluded, defendant could have been granted a new trial where N.H.'s inculpatory statements would be admitted.

¶ 64    The State argues that this case is similar to *Mars*, where this court affirmed the summary dismissal of a *pro se* postconviction petition on the ground that it did not match the argument set forth on appeal. In the petition, Mars alleged that " '[d]efense counsel failed to challenge the sufficiency of the grand jury indictment which omitted essential elements of the charges. But for, [*sic*] counsel's ineffective assistance of counsel's [*sic*] no trier of fact could have found petitioner guilty beyond any reasonable doubt of first degree murder.' " *Mars*, 2012 IL App (2d) 110695, ¶ 31. However, on appeal from the summary dismissal, Mars argued that counsel on direct appeal was ineffective for not arguing that the 2007 indictment was subject to compulsory joinder with the 2005 indictment and violated Mars' speedy-trial rights. As in this case, the State responded that the appellate argument was forfeited because it was not articulated in the petition. *Mars*, 2012 IL App (2d) 110695, ¶ 31.

¶ 65    We observed that Mars' petition alleged that his "defense counsel" was ineffective for not challenging the indictment for lack of essential elements of the crimes charged. *Mars*, 2012 IL App (2d) 110695, ¶ 33. As such, the petition addressed trial counsel's failure to bring the allegedly faulty indictment to the trial court's attention and the consequences of that omission at trial. In contrast, postconviction appellate counsel explicitly referred to errors of direct appellate counsel. We held that "[n]o matter how liberally we construe the [petition's] allegation, viewing it in context, we cannot conclude that by this allegation defendant

- 12 -

actually raised a claim relating to appellate counsel's failure on direct appeal to raise the issue of compulsory joinder and violation of his right to a speedy trial." (Emphasis omitted.) *Mars*, 2012 IL App (2d) 110695, ¶ 33. The subject matter raised in the petition could not have been compulsory joinder and speedy trial in the context of something his trial attorney failed to do, because trial counsel, in fact, brought a motion to dismiss the 2007 indictment based on compulsory joinder and a violation of Mars' right to a speedy trial. We concluded that the issues of compulsory joinder and speedy trial were forfeited as they were not raised in the petition, and we affirmed the first-stage dismissal of the petition. *Mars*, 2012 IL App (2d) 110695, ¶ 33.

¶ 66      *Mars* is distinguishable from this case. In *Mars*, the petition faulted trial counsel for omissions related to the sufficiency of the charging instrument, while the postconviction appellate argument faulted direct appellate counsel for omissions related to compulsory joinder and speedy-trial rights, which trial counsel had previously addressed. The petition and the postconviction appellate argument shared no underlying subject matter and identified different attorneys as having rendered ineffective assistance. Here, the petition and the postconviction appellate arguments both allege ineffectiveness of appellate counsel for omissions related to the underlying issue of the admissibility of N.H.'s confession.

¶ 67      The State implies that *Mars* permits a narrower reading of claims for purposes of first-stage postconviction review when the *pro se* petition is coherent and organized and displays a general awareness of legal concepts. Indeed, we noted that Mars' petition "set[ ] forth the record facts in a logical fashion with appropriate record citations and raise[d] specific legal challenges with regard to appellate counsel, such as counsel's failure to raise a 'Brady Violation' and the State's failure to connect him to the sepsis that killed the victim." *Mars*, 2012 IL App (2d) 110695, ¶ 33. However, that observation should not be viewed as holding a well-reasoned and articulate *pro se* petition to a higher standard than one that is drafted less artfully.

¶ 68      We further reject the State's argument that *People v. Cole*, 2012 IL App (1st) 102499, supports affirming the summary dismissal of the petition. A jury convicted Cole of two counts of attempted first-degree murder, and on direct appeal he argued that trial counsel rendered ineffective assistance on three grounds: (1) failure to file a motion to quash his arrest and suppress evidence premised on the lack of probable cause for his arrest; (2) failure to object to leading questions of a victim and to a police officer's testimony; and (3) failure to object to " 'prejudicial and baseless' " closing arguments by the prosecutor, including a comment that a victim's testimony was " 'credible.' " *Cole*, 2012 IL App (1st) 102499, ¶ 3. Cole also argued that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The Appellate Court, First District, rejected each argument and affirmed the convictions.

¶ 69      Cole filed a *pro se* postconviction petition, alleging, *inter alia*, that (1) the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to " 'properly question the venire' " regarding the principles underlying the trial and (2) the prosecutor engaged in misconduct during closing argument when he injected his personal belief by characterizing a victim as " 'a credible witness,' " each of which Cole alleged violated his right to due process. *Cole*, 2012 IL App (1st) 102499, ¶ 4. The postconviction court dismissed the petition at the first stage of the proceedings, concluding that the two claims

could have been raised on direct appeal and that they were rebutted by the record. *Cole*, 2012 IL App (1st) 102499, ¶ 5.

¶ 70    Postconviction appellate counsel argued that the petition presented the "gist" of two constitutional claims based on issues that direct appellate counsel failed to raise. First, Cole claimed that the trial court failed to strictly abide by Rule 431(b) in the course of questioning prospective jurors. Second, he claimed that prosecutorial misconduct occurred during the State's closing argument when it commented on the "credibility" of a prosecution witness. Postconviction appellate counsel argued that direct appellate counsel's failure to raise these issues rendered his assistance constitutionally ineffective. *Cole*, 2012 IL App (1st) 102499, ¶ 9.

¶ 71    The State argued that Cole had forfeited the arguments raised in the postconviction appeal, because the petition did not refer to direct appellate counsel's performance. Cole responded that " '[a] petitioner who raises a trial error in a post-conviction petition, asserting the claim has merit, also necessarily alleges the ineffectiveness of the appellate attorney who was to blame for failing to raise and preserve the claim on direct appeal.' " *Cole*, 2012 IL App (1st) 102499, ¶ 11. The First District rejected that assertion, relying on *People v. Jones*, 213 Ill. 2d 498, 504 (2004), to hold that " 'implicit' claims in the defendant's postconviction petition may not be raised for the first time on appeal when those postconviction issues were never ruled upon by the circuit court." *Cole*, 2012 IL App (1st) 102499, ¶ 13.

¶ 72    The stark differences between the petitions in the two cases illustrate that the *Cole* court's reliance on *Jones* was misplaced. Following Jones's conviction, he filed a *pro se* postconviction petition that was a preprinted form with blank spaces for handwritten text. One paragraph was intended to present the basis of the petition and read as follows:

> " 'That petitioner contends, as supported by the attached affidavits, that he was denied his right to _____ guaranteed by the _____ and Fourteenth Amendments of the United States Constitution; and that such denial is not reflected on the record of the appeal of his conviction:
>
> (a) [State here how you were denied a fair trial]
>
> (b) [Same as above]' " *Jones*, 213 Ill. 2d at 502.

¶ 73    Jones wrote the words "effective assistance of counsel" and "Sixth," respectively, in the blank spaces. Jones did not provide any elaboration in either subparagraph (a) or (b). Jones verified the petition by attaching an affidavit, but the affidavit contained nothing more than Jones's notarized signature attesting to the truthfulness of the allegations in the petition. *Jones*, 213 Ill. 2d at 502. The trial court summarily dismissed the petition as frivolous and patently without merit, stating that the petition " 'completely failed to assert any claim at all, much less even the gist of a constitutional claim.' " *Jones*, 213 Ill. 2d at 502.

¶ 74    On postconviction appellate review, counsel argued for the first time that the trial court erroneously admonished Jones under Illinois Supreme Court Rule 605 (eff. Oct. 1, 2001). The First District affirmed the summary dismissal on the ground that Jones had "failed to present 'any detail whatsoever' in his petition–'[m]erely alleging he was denied his sixth amendment right to effective assistance of counsel, with nothing more, [was] insufficient.' " *Jones*, 213 Ill. 2d at 502-03 (quoting *People v. Jones*, 341 Ill. App. 3d 103, 107 (2003)). On appeal to the supreme court, counsel conceded that the petition did not satisfy even the low threshold of presenting "a modest amount of detail," even without legal argument or citation

to legal authority. *Jones*, 213 Ill. 2d at 504 (citing *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)).

¶ 75    In affirming the summary dismissal, the supreme court commented on certain challenges encountered by postconviction appellate counsel on review of a first-stage dismissal. Because counsel is appointed for the first time on appeal from a summary dismissal, postconviction appellate counsel often spots errors that the petition did not draw to the trial court's attention. The supreme court observed:

> "Stated bluntly, the typical *pro se* litigant will draft an inartful pleading which does not survive scrutiny under the 'frivolity/patently without merit' standard of section 122-2.1, and it is only during the appellate process, when the discerning eyes of an attorney are reviewing the record, that the more complex errors that a nonattorney cannot glean are discovered. The appellate attorney, not wishing to be remiss in his or her duty, then adds the newly discovered error to the appeal despite the fact that the claim was never considered by the trial court in the course of its ruling. The thought process behind the attorney's actions is clear–the attorney is zealously guarding the client's rights and is attempting to conserve judicial resources by raising the claim expeditiously at the first available chance. These goals are laudable, but they nonetheless conflict with the nature of appellate review and the strictures of the Act." *Jones*, 213 Ill. 2d at 504-05.

¶ 76    The *Jones* court then stated generally that claims not raised in a *pro se* postconviction petition may not be raised for the first time on appeal from the first-stage dismissal of that petition. *Jones*, 213 Ill. 2d at 505. The *Cole* court interpreted this language too broadly to hold that postconviction appellate counsel may not raise implicit claims derived from a *pro se* petition's factual allegations.

¶ 77    The *Jones* court did *not* hold that a petition's legal arguments must be explicit or that claims implied by the factual allegations of a petition are forfeited. In fact, such a holding would be inconsistent with section 122-2 of the Act, which provides, in part, that "[a]rgument *** shall be omitted from the petition." 725 ILCS 5/122-2 (West 2012). Instead, Jones's petition failed because it alleged ineffective assistance of counsel but contained no factual detail whatsoever. The petition neither identified which attorney erred nor alleged any facts from which an error could be inferred.

¶ 78    Regardless of our skeptical view of the *Cole* court's rationale, we need not quarrel with the outcome, because *Cole* is factually distinguishable from this case. Cole's petition attributed the trial errors to the trial court and failed to allege ineffective assistance of either trial counsel or direct appellate counsel. In contrast, defendant's petition alleges that both trial counsel and direct appellate counsel were ineffective. His postconviction appellate argument deviates from the petition only in that he argues that appellate counsel was ineffective for failing to attribute the errors to the trial court.

¶ 79    This case is more like *Hodges*, which also involved a *pro se* petition alleging ineffective assistance of counsel and containing factual allegations that ultimately supported a different, but related, legal theory of postconviction relief. In *Hodges*, the defendant was convicted of first-degree murder, and after a direct appeal he filed a *pro se* postconviction petition. The petition alleged that his trial counsel was ineffective for failing to produce evidence that would have supported his claim of self-defense. Specifically, the petition alleged, among other things, that counsel failed to investigate or interview three potential witnesses whose

testimony would have corroborated his theory of self-defense, and he provided a detailed description of their expected testimony. *Hodges*, 234 Ill. 2d at 6.

¶ 80 Hodges' theory of defense at trial was twofold. Counsel argued that Hodges fired toward the victim in self-defense, reasonably believing that his life was in danger, and that Hodges therefore should be acquitted of first-degree murder. In the alternative, counsel argued that, if Hodges' belief that his life was in danger was found to be unreasonable, the verdict should be second-degree murder. Over the State's objection, the trial court determined that there was sufficient evidence to warrant instructing the jury on self-defense and on second-degree murder based on an actual but unreasonable belief that use of force was justified. The jury was instructed as to each of these defenses. *Hodges*, 234 Ill. 2d at 19.

¶ 81 On appeal from the summary dismissal of the petition, the appellate court held that, even if the three witnesses had testified, their testimony would not have supported Hodges' theory that he acted in self-defense. The appellate court did not address whether this testimony would have supported a theory of "unreasonable belief" second-degree murder. The supreme court agreed that the testimony of the three witnesses would not have supported Hodges' theory of self-defense. The supreme court concluded that, with regard to the theory of self-defense, the claim that counsel was ineffective for failing to investigate the three witnesses was completely contradicted by the record. *Hodges*, 234 Ill. 2d at 20.

¶ 82 However, the supreme court did not reach the same conclusion regarding "unreasonable belief" second-degree murder. As part of the jury instruction on second-degree murder, the jury was instructed not to convict Hodges of first-degree murder if it found, by a preponderance of the evidence, that Hodges, at the time of the killing, believed that circumstances existed that would justify the deadly force he used, but this belief was unreasonable. In the supreme court's view, it was "at least arguable" that testimony from three witnesses indicating that the victim was armed on the night of the shooting would have supported a theory that Hodges believed, albeit unreasonably, that his actions were justifiable. *Hodges*, 234 Ill. 2d at 20-21.

¶ 83 In reviewing the summary dismissal of the petition, the appellate court did not address whether the three witnesses' testimony would have supported a theory of second-degree murder. According to the State, the reason the appellate court addressed only self-defense and not second-degree murder was that Hodges' petition focused only on the impact the witnesses' testimony would have had on self-defense. Hodges did not expressly allege that this same testimony would have supported second-degree murder. The State argued that Hodges, though acting *pro se*, " 'chose' " to focus only on self-defense and not on second-degree murder and that he should be held to that choice. *Hodges*, 234 Ill. 2d at 21.

¶ 84 The supreme court rejected that argument, concluding that "[t]he State's strict construction of [Hodges'] petition is inconsistent with the requirement that a *pro se* petition be given a liberal construction." *Hodges*, 234 Ill. 2d at 21. The court observed that the issue of whether the petition, which focused on self-defense, could be said to have included allegations regarding " 'unreasonable belief' " second-degree murder, also known as "imperfect self-defense," was at minimum the type of " 'borderline' " question that, under a liberal construction, should be answered in Hodges' favor. *Hodges*, 234 Ill. 2d at 21.

¶ 85 This case is similar to *Hodges*. Like in *Hodges*, the State asks us to hold defendant, who also filed his petition *pro se*, to his "choice" of focusing on trial counsel's handling of N.H.'s statement to the detectives, rather than consider the related arguments of whether the trial

court erred in excluding N.H.'s statements to Chaplain Fricks and whether the chaplain's testimony would have corroborated the statement to the detectives. Consistent with *Hodges*, we conclude that the State's strict construction of the petition is inconsistent with the requirement that a *pro se* petition be given a liberal construction. See *Hodges*, 234 Ill. 2d at 21. Whether the petition, which focuses on trial counsel's handling of N.H.'s statement to the detectives, could be said to also include allegations regarding trial counsel's handling of Chaplain Fricks' testimony regarding the same events is at minimum the type of "borderline" question that, under a liberal construction, should be answered in defendant's favor.

¶ 86    We reiterate that, when a *pro se* petition is summarily dismissed, postconviction appellate counsel may not present novel arguments that bear no relationship to the petition. To do so would circumvent the Act by substituting appellate advocacy for second-stage postconviction proceedings in the trial court, where counsel is appointed and the petition may be amended. Any concern of distorting the Act is unwarranted here, however, as defendant has not presented a novel claim in this appeal. Both in the petition and on appeal from the summary dismissal, defendant has (1) alleged ineffective assistance of appellate counsel, (2) addressed the same underlying subject matter, *i.e.* N.H.'s confessions to the detectives and to Chaplain Fricks, and (3) identified as error the ruling on Chaplain Fricks' testimony.

¶ 87    On appeal from the summary dismissal of defendant's *pro se* petition, counsel needed to tailor the arguments to the petition's factual allegations, which caused a modest departure from the legal conclusion contained in the petition. The present arguments are not forfeited, because the assertions in the petition need bear only "some relationship" to the arguments raised on appeal. See *Mars*, 2012 IL App (2d) 110695, ¶ 32.

¶ 88    The State suggests that defendant would not be prejudiced by a finding of forfeiture, because he could file another petition under the Act, restating his present appellate arguments regarding Chaplain Fricks. The Act provides that "[o]nly one petition may be filed by a petitioner under this Article without leave of the court." 725 ILCS 5/122-1(f) (West 2012). A court may grant leave to file a successive petition "only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2012). "To establish 'cause,' the defendant must show some objective factor external to the defense impeded his ability to raise the claim in the initial postconviction proceeding." *People v. Coleman*, 2013 IL 113307, ¶ 82 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002)). "To establish 'prejudice,' the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process." *Coleman*, 2013 IL 113307, ¶ 82 (citing *Pitsonbarger*, 205 Ill. 2d at 464). This is certainly a higher burden than defendant would face in seeking leave to file a successive petition.

¶ 89    The possibility of defendant's obtaining leave to file a successive petition is not a basis for finding that his present appellate arguments are forfeited. *Pro se* petitions should be viewed with a lenient eye, needing to bear only "some relationship" to the issue raised on appeal, and the ability to file a successive petition is not relevant to the review of a first-stage dismissal.

¶ 90                          D. Clergy-Penitent Privilege

¶ 91    On appeal, defendant argues that "the trial court was wrong when it ruled that [N.H.'s] confession was barred by the clergy-penitent privilege, and appellate counsel was ineffective

when he failed to raise this fully-preserved issue on direct appeal." We agree with defendant, but only to the extent that he raises the gist of a constitutional claim at the first stage of postconviction proceedings.

¶ 92 The trial court cited the clergy-penitent privilege as authority for excluding Chaplain Fricks' testimony. The privilege is codified in section 8-803 of the Code of Civil Procedure (Code), which provides as follows:

> "Clergy. A clergyman or practitioner of any religious denomination accredited by the religious body to which he or she belongs, shall not be compelled to disclose in any court, or to any administrative board or agency, or to any public officer, a confession or admission made to him or her in his or her professional character or as a spiritual advisor in the course of the discipline *enjoined by the rules or practices of such religious body or of the religion which he or she professes*, nor be compelled to divulge any information which has been obtained by him or her in such professional character or as such spiritual advisor." (Emphasis added.) 735 ILCS 5/8-803 (West 2012).

¶ 93 The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature, and the best indication of that intent is a statute's language, given its plain and ordinary meaning. *People v. McCarty*, 223 Ill. 2d 109, 124 (2006). "When the statutory language is clear and unambiguous, it must be applied as written without resort to extrinsic aids of statutory interpretation." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 56. "We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature." *Gaffney*, 2012 IL 110012, ¶ 56.

¶ 94 Before evidence is excluded as privileged, the party asserting the privilege must establish all of the privilege's constituent elements. *People v. Diercks*, 88 Ill. App. 3d 1073, 1077 (1980). Section 8-803 of the Code allows the clergy-penitent privilege to be raised when disclosure by the clergyman is "enjoined by the rules or practices of such religious body or of the religion which he or she professes." 735 ILCS 5/8-803 (West 2012); see *People v. Burnidge*, 279 Ill. App. 3d 127, 131 (1996); *People v. Bole*, 223 Ill. App. 3d 247, 262 (1991). The clergyman cannot be "compelled to divulge any information which has been obtained by him or her in such professional character or as such spiritual advisor." 735 ILCS 5/8-803 (West 2012); see *Burnidge*, 279 Ill. App. 3d at 131; *Bole*, 223 Ill. App. 3d at 262. The privilege belongs both to the person making the statement and to the clergyman. *Burnidge*, 279 Ill. App. 3d at 131; *Bole*, 223 Ill. App. 3d at 262-63. When the clergyman does not object to testifying, the burden shifts to the person asserting the privilege to show that disclosure is enjoined by the rules or practices of the relevant religion. *Diercks*, 88 Ill. App. 3d at 1077.

¶ 95 Before trial, N.H. argued that Chaplain Fricks could not testify about their conversations, because he would be disclosing "a confession or admission made to him or her in his or her professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he or she professes." 735 ILCS 5/8-803 (West 2012). When Chaplain Fricks withdrew his objection to testifying, the burden shifted to N.H. to show that Chaplain Fricks' disclosure was prohibited by the rules of his religion. The State admitted that Chaplain Fricks already had testified that the rules of his religion did not prohibit the disclosure, and N.H. did not offer any evidence to the contrary. Under the plain and ordinary meaning of the statutory language, the court's

- 18 -

determination that section 8-803 barred Chaplain Fricks' testimony is not supported by the evidence adduced at the hearing.

¶ 96    The trial court found compelling N.H.'s expectation of confidentiality, but this court has held that the penitent's expectation does not affect the application of section 8-803. In *Bole*, Bole argued that a conversation with his minister, during which he confessed to a crime and sought "spiritual help," was privileged under section 8-803. This court rejected the claim of privilege because the minister testified that he had told Bole before the conversation that he was ineligible for counseling because he had previously lied to the minister. This court concluded that Bole's admissions "were not obtained by the minister in his professional character or as a spiritual advisor." *Bole*, 223 Ill. App. 3d at 263.

¶ 97    We rejected Bole's argument that the "perception" of the penitent determines whether the privilege applies. *Bole*, 223 Ill. App. 3d at 263. We held that, although the statute is designed to protect those communications between clergymen and laymen that originate in a confidence that they will not be disclosed, the statute does not provide that the penitent's "perception" determines when this confidence arises. If this were the case, there would be no reason to limit the privilege to those situations where a confession or admission is enjoined from disclosure by the rules or practices of the religious body or religion. Regardless of the existence of such rules or practices, a defendant could merely assert that he believed the statements were communicated in confidence and that therefore the privilege applied. *Bole*, 223 Ill. App. 3d at 263.

¶ 98    Bole could not invoke section 8-803 to bar the minister from testifying about their conversations, regardless of Bole's expectation of confidentiality. Likewise, N.H. may not rely on his expectation of confidentiality to invoke section 8-803 to prevent Chaplain Fricks from testifying.

¶ 99    The State alternatively contends that N.H.'s statements to Chaplain Fricks were properly excluded as vague and unreliable. At the first stage of postconviction proceedings, the petition must be liberally construed and taken as true, and the postconviction court may not engage in fact finding. *People v. Hommerson*, 2013 IL App (2d) 110805, ¶ 7. Consideration of the petition and the record demonstrates the existence of a factual issue that requires advancing the petition to the second stage. Stated another way, the record does not contradict the allegations of the petition such that defendant's legal theory of the case is indisputably meritless. See *Hodges*, 234 Ill. 2d at 16.

¶ 100    Defendant's *pro se* petition states the gist of a constitutional claim under *Strickland* in that direct appellate counsel's performance arguably fell below an objective standard of reasonableness and the error arguably prejudiced defendant. See *Strickland*, 466 U.S. at 687. Failing to raise on direct appeal the potentially meritorious claim for a new trial in light of the exclusion of Chaplain Fricks' testimony was arguably objectively unreasonable and not a matter of trial strategy. See *Ramsey*, 239 Ill. 2d at 433. Moreover, defendant has shown that counsel's performance arguably rendered the result of the trial unreliable in that Chaplain Fricks' testimony could have affected the verdict by proving defendant's innocence. See *Evans*, 209 Ill. 2d at 220.

¶ 101                    E. Credit for Presentence Custody

¶ 102    Finally, defendant asks that we correct the mittimus to show that he spent 893 days in presentence custody. Section 5-4.5-100(b) of the Unified Code of Corrections provides that an offender shall be given credit against his prison sentence for time spent in custody as a result of the offense for which the sentence was imposed. 730 ILCS 5/5-4.5-100(b) (West 2012). Defendant was arrested on April 29, 2007, and sentenced on October 8, 2009, at which point he had spent 893 days in presentence custody. The sentencing order credits defendant with only 889 days of presentence custody.

¶ 103    Defendant did not raise the issue in his *pro se* postconviction petition but argues on appeal that an amended mittimus may be issued at any time. See *People v. Woodard*, 175 Ill. 2d 435, 457 (1997) (such claim of error cannot be forfeited and an amended mittimus may be issued at any time). The State does not address the issue. In the absence of any challenge from the State, we modify the mittimus to correct the error.


¶ 104                              III. CONCLUSION

¶ 105    The judgment of the circuit court of Winnebago County dismissing the *pro se* postconviction petition is reversed, and the cause is remanded for further postconviction proceedings consistent with this opinion. The mittimus is modified to reflect 893 days spent in presentence custody.


¶ 106    Reversed and remanded; mittimus modified.