2021 IL App (1st) 200165-U

SECOND DIVISION
October 26, 2021

No. 1-20-0165

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the |
| Respondent-Appellee, | ) ) | Circuit Court of Cook County. |
| v. | ) ) | No. 13 CR 13268 (02) |
| ANTONIO BRYANT, | ) ) | Honorable |
| Petitioner-Appellant. | ) ) ) | Vincent M. Gaughan, Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The circuit court erred in summarily dismissing the petitioner's *pro se* postconviction petition where the petitioner made an arguable claim of actual innocence.

¶ 2    The petitioner, Antonio Bryant, appeals from the circuit court's summary dismissal of his postconviction petition filed pursuant to the Postconviction Hearing Act (725 ILCS 5/122-1 *et seq*.

(West 2018)). On appeal, the petitioner contends that the circuit court erred in summarily dismissing his petition where he set forth an arguable claim of actual innocence as to his convictions for attempted murder and aggravated assault of a peace officer, when he presented new evidence establishing that the State's main eyewitness, now former Chicago police officer Ronald Coleman, had amassed over 60 misconduct complaints and was the subject of a federal investigation for obstruction of justice. For the following reasons, we reverse and remand for further proceedings under the Act.

¶ 3                                    I. BACKGROUND

¶ 4      The record before us reveals the following relevant facts and procedural history.  Together with codefendants, Donzell Bonner, Deandre Fields, Dajuan Gates and Tyshawn Reese, the petitioner was charged with *inter alia*, attempted murder, aggravated battery with a firearm, aggravated assault of a peace officer, and armed habitual criminal, all arising from two shooting incidents that occurred in Chicago on the evening of April 28, 2013. Among other things, relevant to this appeal, the charges alleged that the petitioner personally discharged the firearm that caused great bodily harm to Nicklaus Dorsey. In addition, the charges alleged that the petitioner placed Officer Ronald Coleman in reasonable apprehension of a battery by pointing a firearm at Coleman while knowing him to be a peace officer engaged in the performance of his duties.

¶ 5      The petitioner was tried in a separate but simultaneous bench trial with codefendant Gates. The following relevant evidence was adduced at that trial.

¶ 6      Security guard Francisco Samayoa, who worked at the St. Stephens Terrace Apartments at 2333 West Jackson, testified that he was on patrol on the night of the shooting. At approximately 8:15 p.m. he heard several gunshots coming from Jackson Boulevard and Western Avenue. Samayoa then saw Gates, who was a tenant, the petitioner, who was a frequent visitor, and Reese,

2

who had been banned from the building, attempting to enter the apartment complex, which was put on lockdown after the shots were heard. When they could not enter the building, the three men left. Samayoa averred that the petitioner had nothing in his hands as he was attempting to enter the building. He further stated that later that evening between 10 and 10:30 p.m. he heard more gunshots coming from Oakley Boulevard and Van Buren Street.

¶ 7    Nicklaus Dorsey next testified that at approximately 10:30 p.m. on April 28, 2013, he walked out of his home at 315 South Leavitt Street and headed to his car which was parked across the street. As he did so, he noticed a maroon car parked on the street to his right and someone exiting the driver's side and crossing the street. Dorsey admitted that he was not paying much attention and therefore could not describe the man. Suddenly, Dorsey heard several gunshots and ducked behind his parked car. He then ran back towards his house for safety. Dorsey believed the shots were coming from the direction of the maroon car, which was behind him, but stated that he did not look in that direction and did not see anyone shooting at him. Dorsey further testified that once inside his home, he realized that he had been shot because he was bleeding from his side. Dorsey told his father, who called for an ambulance. Dorsey was subsequently taken to the hospital, where it was determined that he sustained a bullet wound to his buttocks.

¶ 8    Chicago narcotics police officer Ronald Coleman next testified that at approximately 10 p.m. that evening, he was off duty, in plain clothes in an unmarked police car at 307 South Leavitt Street. The officer had his badge, and his weapon, a .45-caliber semiautomatic gun, which was loaded with 10 rounds. Officer Coleman averred that as he was about to move his car from the east to the west side of the street, he saw a maroon four-door Buick with four occupants turn onto Leavitt Street and abruptly stop directly across from his vehicle, about five to six feet away. Officer Coleman then saw a man, whom he later identified as the petitioner exit the rear passenger door of

the Buick and begin firing a gun northwest onto Jackson Boulevard. When the petitioner returned to the vehicle, Officer Coleman observed a second man, whom he later identified as codefendant Reese, exit the vehicle from the rear driver side door and shoot southeast. After numerous gunshots, the maroon Buick drove away heading south on Leavitt Street.

¶ 9      Officer Coleman called 911, identified himself as a police officer and reported the incident. He then made a U-turn in his car to follow the maroon Buick and, as he did so, observed a man lying on the ground, who said, "These motherf*****s shot me."

¶ 10     Officer Coleman testified that he caught up to the Buick as it came to a stop at a red light on Oakley Boulevard and Van Buren Street.  He noticed that there was a state trooper conducting a traffic stop at the corner and that the petitioner and Reese slid down into the back seat of the maroon Buick so as not to be observed by the trooper. Officer Coleman stopped his car next to and behind the maroon Buick, exited and tried to get the trooper's attention by announcing his office. Officer Coleman approached the maroon car, held up his badge in his left hand and his service weapon in his right and announced his office by yelling at the occupants, "Police. Police. Stop the car."

¶ 11     As the officer took a few more steps towards the maroon car, again announcing his office, he observed Reese turn around in the rear driver seat and point a gun at him. Officer Coleman discharged his weapon at Reese, shooting 10 rounds and hitting the Buick as it sped away. Officer Coleman testified that he then was approached by the state trooper who asked if he was a police officer.  After Officer Coleman responded affirmatively and described what he had witnessed on Leavitt Street, the trooper pursued the maroon car.

¶ 12     Officer Coleman averred that the next day, he viewed two photographic arrays from which he identified the petitioner as the shooter from the rear passenger side of the Buick on Leavitt

Street. The officer also identified Reese as the shooter from the rear driver side of the Buick on Leavitt, as well as the one who pointed the gun at him while the car was stopped at Oakley Boulevard and Van Buren Street. The officer also later viewed a physical lineup from which he again identified Reese.

¶ 13    The State next introduced into evidence two video surveillance footages: (1) from the state trooper's patrol car recording the traffic stop at Oakley Boulevard and Van Buren Street; and (2) from cameras positioned at a nearby high school recording what occurred at Leavitt Street. Officer Coleman was asked to describe the content of both footages as they were played for the court. While the videos corroborated the officer's testimony about the sequence of events that night, neither corroborated his identifications of the petitioner or Reese. Moreover, while both videos were introduced and published at trial, neither was made part of the record on appeal.

¶ 14    Illinois State Trooper Timothy Mayerbock next testified that at about 10 p.m. on the night in question he was on-duty, in uniform and in a marked squad car at a traffic light at Oakley Boulevard and Van Buren Street conducting a traffic stop of a random vehicle. As he approached that vehicle on its passenger side, the traffic light was red and he saw two cars in the intersection, one of which was red and contained four occupants. Then he noticed a man, whom he later identified as Officer Coleman, approach from his left, yelling, "Police," and observed him fire ten shots into the red car, which sped away. Trooper Mayerbock testified that after the shots were fired, he produced his own firearm and ascertained that the individual brandishing the gun was in fact a police officer. After Officer Coleman gave Trooper Mayerbock a description of what had occurred at Leavitt Street earlier that evening, the trooper reported the incident and then pursued the red car.

¶ 15    Although he was unable to apprehend it, Trooper Mayerbock soon received a radio call

that a red car had been found a few blocks away on Maplewood Avenue. When he proceeded to that location, the trooper observed the same red car from the intersection, with its rear window shot out, a revolver in plain view inside the vehicle, and blood trails leading away from the car.

¶ 16    Chicago Police Officer Maureen O'Hearn–Boyle next testified that at about 10 p.m. that night, together with her partner she responded to a call of a person shot in the 300 block of Maplewood Avenue. Once there, she was directed by witnesses to an alley where she found the petitioner, who was bleeding from several gunshot wounds to his neck and head. When an ambulance arrived, codefendant Gates approached the officers and asked who was in the ambulance. After other officers arrived, officer Boyle followed a trail of blood from the alley to a gangway and found a maroon Buick in the middle of the street. She testified that the back windshield had been shot out and that inside she saw a revolver in plain view in the backseat, as well as blood, broken glass, and bullet holes.

¶ 17    Chicago Police Detective James DeCicco, who was assigned to investigate the shooting on Leavitt Street, next testified that on April 30, 2012, together with his partner, he went to the hospital to interview the petitioner. Detective DeCicco averred that even though the petitioner "had IVs in him," he was in stable condition, responded to his questions "right away" and agreed to speak to him.  According to the detective, the petitioner told him that earlier on the day of the shooting, he was walking with Gates on Jackson Boulevard and Western Avenue when they saw ten people come from an alley, one of which pointed a gun at them and started shooting. The petitioner and Gates ran into a nearby restaurant and waited until it was safe to come out. The petitioner then went to the front of the St. Stephens apartment complex and called his girlfriend to pick him up. When she did not arrive, the petitioner started to walk to a nearby store when he saw Fields driving by with Reese and another man he did not know. The petitioner asked Fields for a

ride to his aunt's house and Fields obliged.

¶ 18    The petitioner further told Detective DeCicco that as they approached Leavitt Street, he asked Fields to turn left, but Fields turned right. As soon as they made the turn, the petitioner saw someone standing on the corner of Leavitt Street and Jackson Boulevard. According to the petitioner, Reese then exited the car and started shooting.  The petitioner next saw several people coming down an alley on his side of the car, so he picked up a revolver that was in the car, got out and shot twice into the air.  He and Reese then got back into the car, which drove away. The petitioner told the detective that all he could remember after that was hearing more gunshots and feeling pain the back of his head.

¶ 19    On cross-examination, Detective DeCicco admitted that his interview with the petitioner took place only two days after the incident during which the petitioner had been shot multiple times in the head. The detective also confirmed that the interview occurred at 1:00 a.m. in a room "off of the emergency room" because the petitioner had just exited surgery and had been under anesthesia. Detective DeCicco further admitted that he did not record or memorialize his interview with the petitioner in any way.

¶ 20    Chicago Police Detective Robert Garza next testified that during his investigation of the shooting, he proceeded to Maplewood Avenue where he discovered the maroon car, and a blood trail from it leading into the alley. Once in the alley, he was approached by codefendant Gates, who told him that the petitioner, who was his cousin, had been shot, and that he had come out to see what had happened. Detective Garza testified that he transported Gates to the police station where he interviewed him. Garza told the detective that he had been shot earlier that day on Jackson Boulevard and Western Avenue. Garza further said that later that day when he saw Fields and another man in a Buick, he asked them to give him a ride because he wanted to look for the people

that had shot at him to retaliate. When Fields agreed, Gates retrieved the petitioner and the two went to meet Fields. Gates asked the group to wait while he got cigarettes, but by the time he returned the Buick was gone, as were Field and the petitioner. Angry that they left him, Gates called the petitioner on his cell phone, whereupon the petitioner told him to go home. Gates later saw the Buick drive by, eventually followed by police personnel. As he was standing outside, Fields ran up to him and told him the petitioner had been shot by a police officer that had pulled up next to them.

¶ 21 Forensic investigator Paul Presnell next testified that he examined and photographed the scenes at Van Buren Street, Leavitt Street and Maplewood Avenue. At Van Buren Street, he discovered ten .45-caliber cartridge casings and a turn signal from a car. On Leavitt Street he found nine .45-caliber cartridge casings and a spent bullet. At Maplewood Avenue, he discovered that the maroon Buick was missing a turn signal that "probably" matched the one he recovered at Van Buren Street. In addition, at Maplewood Avenue on the back floor of the Buick he discovered a .45-caliber revolver, which contained five spent shell casings, as well as two cell phones on the rear seat. Presnell swabbed the revolver and the cell phones and took Officer Coleman's gun for comparison.

¶ 22 The parties next stipulated that two .45-caliber bullets and a bullet fragment were found inside the Buick. While it was conclusively established that these were not fired from the revolver found inside the car, Officer Coleman's weapon, could not be excluded. The parties further stipulated that the five cartridge casings found inside the revolver were fired from the revolver, the ten cartridge casings found at Van Buren Street had been fired from Officer Coleman's gun, and the nine cartridge casings found at Leavitt Street were fired by a gun that was neither the one retrieved from the Buick nor the one belonging to Officer Coleman. In addition, the parties

stipulated that no usable fingerprints were found on the revolver, on the spent cartridge casings inside the revolver, or any of the cartridges found on Leavitt Street. The parties further stipulated that the petitioner's fingerprint was found on the rear passenger door of the Buick, and that this DNA was found on both cell phones and in the blood recovered from the backseat of the Buick.

¶ 23    After the State rested its case-in-chief, the petitioner presented no evidence on his own behalf. After hearing closing arguments, the circuit court found the petitioner guilty of attempted first murder, aggravated battery with a firearm, aggravated assault of a peace officer, and armed habitual criminal.

¶ 24    At the subsequent sentencing hearing, the court merged the aggravated battery with a firearm conviction with the attempted murder conviction and sentenced the petitioner to 32 years imprisonment for the attempted murder of Dorsey (12 years for the attempted murder conviction and 20 for the mandatory firearm enhancement). In addition, the court sentenced the petitioner to a concurrent sentence of 6 years imprisonment for aggravated assault of a peace officer (Officer Coleman). No sentence was imposed on the petitioner's conviction for armed habitual criminal.

¶ 25    The petitioner appealed arguing that: (1) the State failed to prove beyond a reasonable doubt that he committed the shooting; (2) the State failed to prove that he knew that Coleman was a police officer, and thus his aggravated assault conviction should be reduced to simple assault; (3) his trial counsel was ineffective for failing to file a motion to suppress the statement he made in the hospital to Detective DeCicco; and (4) the circuit court should have appointed counsel at his *Krankel* hearing. See *People v. Bryant*, 2018 IL App (lst) 143578-U, ¶ 1. We affirmed the petitioner's convictions and sentence on direct appeal. *Id*. at ¶ 89.

¶ 26    On September 12, 2019, the petitioner filed the instant *pro se* postconviction petition, alleging, *inter alia*, that his trial counsel was ineffective because he should have investigated

Officer Coleman's extensive history of misconduct as a police officer and impeached his credibility at trial. In support, the petitioner attached a 2016 Chicago Tribune article reporting on an obstruction of justice charge against Coleman in federal court. According to that article, in June 2014, the same month of the petitioner's trial, Coleman, who was assisting the Drug Enforcement Agency (DEA) in a drug investigation, learned that a longtime acquaintance was one of the subjects of the investigation and tipped that subject off through another party by telling him to "stop engaging in illegal activity" and warning him that the police would be executing search warrants at houses where the narcotics and weapons were stored, so that the acquaintance could move the narcotics to another location. The article also reported that Coleman amassed over 60 complaints during his 17 years as a police officer, including, complaints for false arrest, illegal searches, and improper use of his weapon. According to the article, Coleman was also named in three civil lawsuits, two for illegal strip searches and one for shooting a man while he fled.[1]

¶ 27     In his *pro se* petition, the petitioner further argued that he could not be guilty of attempted murder because of all the discrepancies between Dorsey's and Coleman's accounts as to how the incident occurred. Specifically, the petitioner pointed out that Dorsey's and Coleman's accounts differed as to when Dorsey realized he was shot. The petitioner also pointed out that Dorsey was on the southwest side of the street when shots were fired, and that, as such, Coleman's testimony that the shooters fired in the northwest and southeast directions was either false or established that the shooters did not shoot at Dorsey.

¶ 28     Additionally, the petitioner argued that he was not guilty of aggravated assault of a peace

---

[1] Coleman was subsequently convicted of the obstruction of justice charge and was sentenced to five years in federal prison. See *United States v. Coleman*, 914 F. 3d 508, 510 (7th Cir. 2019); see also "Ex-Chicago Cop Gets 5 Years in Prison for Tipping Off Target of Drug Raid" (https://chicago.cbslocal.com/2017/12/14/ex-police-officer-sentenced-obstruction)

officer because no one in the car ever pointed a gun at Coleman when the Buick stopped on Van Buren Street. In doing so, the petitioner specifically asserted that Coleman's testimony could not be trusted because he was a "corrupt officer" and had lied in his testimony about the events leading up to the shooting.

¶ 29     On December 6, 2019, the circuit court summarily dismissed the *pro se* petition.  In doing so, the court did not address whether the new revelations regarding Coleman's misconduct and criminal activity as a police officer could have impacted the verdict. The petitioner now appeals from that summary dismissal.

¶ 30                                        III. ANALYSIS

¶ 31     At the outset, we note that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et. seq.* (West 2018)) provides a three-step process by which a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)). A proceeding under the Act is a collateral attack on a prior conviction and sentence and is therefore "not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994); see *Edwards*, 2012 IL 111711, ¶ 21; *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Accordingly, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are waived.  *Edwards*, 2012 IL 111711, ¶ 21; see also *People v. Ligon*, 239 Ill. 2d 94, 103 (2010); *People v. Reyes*, 369 Ill. App. 3d 1, 12 (2006).

¶ 32     At the first stage of postconviction proceedings, such as here, the circuit court must independently review the petition, taking the allegations as true, and determine whether " 'the

petition is frivolous or patently without merit.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see also *Tate*, 2012 IL 112214, ¶ 9. At this stage, the court may not engage in any factual determinations or credibility findings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing"); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) (Noting that the supreme court has "foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding."). Instead, the court may summarily dismiss the petition only if it finds the petition to be frivolous or patently without merit. See *People v. Ross*, 2015 IL App (1st) 120089, ¶ 30; see also *Hodges*, 234 Ill. 2d at 10. A petition is frivolous or patently without merit if it has no arguable basis either in law or in fact. *Tate*, 2012 IL 112214, ¶ 9. Our supreme court has explained that a petition lacks an arguable basis where it "is based on an indisputably meritless legal theory or a fanciful factual allegation"—in other words, an allegation that is "fantastic or delusional," or is "completely contradicted by the record." *Hodges*, 234 Ill. 2d at 11-12; *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see also *Ross*, 2015 IL App (1st) 120089, ¶ 31. Our review of summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 33 On appeal, the petitioner claims that the circuit court erred in summarily dismissing his *pro se* petition where he set forth an arguable claim of actual innocence as to his convictions for attempted murder and aggravated assault of a peace officer, when he presented new evidence establishing that the State's sole eyewitness, Officer Coleman, had amassed over 60 misconduct

complaints and was the subject of a federal investigation for obstruction of justice.

¶ 34    The State initially responds that the petitioner has forfeited this issue because he did not raise it in his postconviction petition. In support, the State points out that the petition nowhere uses the words "actual innocence" and that instead, any arguments regarding Coleman's misconduct are couched in terms of trial counsel's ineffectiveness. For the following reasons, we disagree.

¶ 35    If an issue is not raised in the original petition, then it may not be raised on appeal.  See 725 ILCS 5/122-3 (West 2018) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."). However, "[b]ecause a *pro se* petitioner will likely be unaware of the precise legal basis for his claim the threshold for survival is low, and a *pro se* petitioner need only allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act." *People v. Thomas*, 2014 IL App (2d) 12001, ¶ 48; see also *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32. Accordingly, "[p]etitions filed *pro se* must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed." *Thomas*, 2014 IL App (2d) 12001, ¶ 48

¶ 36    In the present case, while it is true that the phrase "actual innocence" does not appear anywhere in the petition, the petition itself does set forth enough facts to make out a claim of newly discovered evidence supporting an actual innocence claim. Specifically, the petition alleges that the State did not prove the petitioner guilty beyond a reasonable doubt of attempted murder and aggravated assault of a peace officer. With respect to the attempted murder conviction, the petition points out that the discrepancies between Dorsey's and Coleman's testimonies as to when Dorsey realized he was shot, and from what vantagepoint the shooters fired at Dorsey, establishes that Coleman did not actually see the shooting, and that his testimony was untrue.

¶ 37    Additionally, with respect to the aggravated assault of a peace officer conviction, the

petition asserts that no one inside the Buick ever pointed a gun at Coleman and that Coleman's testimony cannot be trusted because he was a "corrupt officer" and lied in his testimony about the events leading up to the shooting.

¶ 38     Moreover, the petition further alleges that the evidence adduced at the petitioner's trial was inconsistent with the State's theory of the case, that the State failed to prove that the petitioner was accountable for the actions of Reese, and that the new evidence about Officer Coleman would have changed the outcome of the petitioner's trial.

¶ 39     Liberally construing the aforementioned allegations, we find that petition set forth enough facts to make an arguable claim that the new evidence about Coleman would have undermined the officer's testimony and led to the petitioner's acquittal.  Keeping in mind that the *pro se* petitioner was likely unaware of the precise legal basis for his claim, we conclude that the allegations in the petition bear some relationship to the actual innocence issue raised on appeal, so that the issue is not novel but rather based on the same underlying subject matter as the petition. See *Thomas*, 2014 IL App (2d) 121001, ¶ 87 ("the assertions in the petition need bear only 'some relationship' to the arguments raised on appeal") (quoting *Mars*, 2012 IL App (2d) 110695, ¶ 32). Accordingly, we find that the issue is not forfeited for purposes of appeal. *Thomas*, 2014 IL App (2d) 121001, ¶ 87 (noting that the defendant's petition and the postconviction appellate arguments related to the same underlying issue so that the arguments in the defendant's appeal were not forfeited).

¶ 40     In coming to this conclusion, we have considered the decisions in *People v. Tramaine Jones*, 213 Ill. 2d 498, 503 (2004) and *People v. Lee Jones*, 211 Ill. 2d 140, 144 (2004) relied upon by the State and find them inapposite.

¶ 41     In *Tramaine Jones*, the defendant filed a *pro se* petition on a preprinted form that solely stated that he was denied effective assistance of counsel, without any elaboration whatsoever.

14

*Tramaine Jones*, 213 Ill. 2d at 502. Subsequently, on appeal from the dismissal of that petition, for the first time, the defendant challenged the sufficiency of the trial court's admonitions relating to his guilty plea. *Id*. Unlike *Jones*, the petitioner here alleged numerous facts supporting his claim that newly discovered evidence of Officer Coleman's misconduct could have led to his acquittal. While the petitioner's actual innocence argument may be "implied rather than explicit his allegation of facts sufficient to support his argument is all that the Act requires." *People v. Warren*, 2016 IL App (1st) 090884-C, 139; see also *Thomas*, 2014 IL App (2d) 121001, ¶ 77 (noting that in *Tramaine Jones*, the Illinois Supreme court "did *not* hold that a petition's legal arguments must be explicit or that claims implied by the factual allegations of a petition are forfeited" (emphasis in original)).

¶ 42    *Lee Jones* is similarly distinguishable. In that case, the defendant's conviction was overturned on appeal. *Lee Jones*, 211 Ill. 2d at 142. Upon remand, the defendant pleaded guilty to first degree murder and armed robbery and received consecutive sentences of 22- and eight-years imprisonment. *Id.* The defendant subsequently filed a *pro se* postconviction petition, arguing that she had not been admonished about the possibility of consecutive sentences before she pleaded guilty on remand. *Id*. at 142. On appeal from the dismissal of her *pro se* petition, for the first time, the defendant argued that: (1) she had received ineffective assistance of prior appellate counsels because counsels had not argued that retrial was barred by principles of double jeopardy; and (2) her conviction and sentence for armed robbery should be vacated because of the one-act, one crime rule and because armed robbery was a lesser included offense of felony murder. Thus, in *Lee Jones*, it was apparent that the claims raised in the defendant's appeal were completely different from the claim she raised in her *pro se* petition. *Id*. On the contrary, in the present case, the actual innocence claim that the petitioner raises on appeal can clearly be inferred from the numerous facts he pleaded

in his *pro se* petition.

¶ 43    Because we find that the petitioner has not forfeited the issue for review, we turn to the merits of his actual innocence claim.

¶ 44    An actual innocence claim is cognizable under the Act because the conviction of an innocent person violates the due process clause of the Illinois Constitution. *People v. Washington*, 171 Ill. 2d 475, 489 (1996); see also *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) ("The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence.").

¶ 45    To establish a claim of actual innocence at the first stage of postconviction proceedings, the petitioner was required to show that the supporting evidence was arguably: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48; *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing *People v. Edwards,* 2012 IL 111711, ¶ 32).

¶ 46    On appeal, the State first argues that the petitioner failed to establish that the evidence of Coleman's misconduct is newly discovered because the multitude of complaints and civil lawsuits against Officer Coleman could have been obtained at trial through the Freedom of Information Act (FOIA) or "simple internet searches." We disagree.

¶ 47    "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶¶ 47-48. The State here ignores the fact that the article attached by the petitioner in support of his actual innocence claim was published in 2016, two years after his trial took place, so that by its very nature, it was discoverable only after the trial. Moreover, the State itself concedes that Officer Coleman's indictment and subsequent conviction on federal obstruction of justice

charges, both occurred years after the petitioner's trial and therefore could not have been obtained through the exercise of any due diligence.

¶ 48    To the extent that the State conjectures based on the attached 2016 article that many of the misconduct complaints against Officer Coleman would have been filed prior to the petitioner's trial, and were therefore discoverable, we disagree. Contrary to the State's position, in determining whether the evidence offered by the petitioner is newly discovered we are not concerned with what was actually in existence at the time of trial, but rather whether that newly offered evidence was "discovered since trial" and whether it is "of such conclusive character that the defendant in the exercise of due diligence could not have discovered it earlier." (Internal quotation marks omitted). *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 61.

¶ 49    This court has previously rejected the assertion that evidence of a police officer's pattern of abuse did not constitute newly discovered evidence even though much of it had occurred prior to a defendant's trial because "[g]iven the sensitive nature of police investigations and the sheer scale of the criminal justice system, it is unreasonable to expect defense counsel to discover" all allegations of police misconduct or abuse. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 162. As such, the State's argument has no merit.

¶ 50    The State next contends that even if we find that the evidence of Officer Coleman's pattern of misconduct is newly discovered, the petitioner's claim nonetheless fails because that evidence is immaterial and cumulative. We disagree.

¶ 51    "Evidence is material if it is relevant and probative of the petitioner's innocence." *Robinson*, 2020 IL 123849, ¶ 47. Moreover, evidence is noncumulative if it "adds to the information that the fact finder heard at trial." *Id.*

¶ 52    Contrary to the State's position, no evidence whatsoever regarding Officer Coleman's

misconduct was presented at trial. Moreover, where the entirety of the State's case rested on Coleman's credibility as he was the only eyewitness who identified the petitioner as the shooter and testified that Reese pointed a gun at him, the evidence of the officer's indictment for obstruction of justice was by no means irrelevant, as it went to the very core of his credibility as a witness.

¶ 53 Lastly, we reject the State's contention that the evidence of misconduct was not of such conclusive character that it would probably change the result on retrial. In this respect, the State argues that the article about Officer Coleman's indictment and the 60 complaints filed against him is not of such conclusive character that it could probably change the result on retrial because the evidence primarily serves to impeach the officer. In support, the State relies on *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008) to argue that impeachment evidence alone is not "conclusive" because it goes to the sufficiency of the evidence to sustain a conviction, rather than a defendant's total "vindication" or "exoneration" as is required to state an actual innocence claim. We strongly disagree.

¶ 54 The holding in *Collier* was recently overturned by our supreme court in *Robinson*, 2020 IL 123849, ¶ 55. The *Robinson* court held that to meet the "conclusive character" requirement of an actual innocence claim, "the new evidence supporting the petition need not be completely dispositive of [the] petitioner's innocence." *Id*. ¶ 85. The court thereby expressly rejected prior caselaw, including *Collier*, which held that the new evidence must either totally "vindicate" or "exonerate" the petitioner. *Id*. ¶¶ 48, 55-56. Instead, our supreme court held that "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. As

the court explained:

> "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation]. Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* ¶ 48.

¶ 55    Applying the holding of *Robison* to the present case, we hold that, liberally construed, the newly discovered evidence attached to the petitioner's *pro se* petition was arguably of such conclusive character that there was a probability that the outcome of the petitioner's trial would have been different.

¶ 56    As already noted above, the State's case against the petitioner on the charges of attempted murder and aggravated assault of a peace officer was premised in its entirety on the single eyewitness testimony of Officer Coleman. Therefore, evidence of the officer's pattern of misconduct and indictment on obstruction of justice charges, which went directly to his veracity as a witness, arguably had the potential of changing the outcome of the petitioner's trial.

¶ 57    This is particularly true where the officer's testimony regarding the shooting of Dorsey on Leavitt Street contradicted Dorsey's own account. In this respect, the record reveals that while the officer testified that he observed the petitioner and Reese firing shots to the northwest and southeast, Dorsey averred that he was located southwest of the maroon car when the shots were fired, and therefore could not have been in the location indicated by Officer Coleman. Moreover, while Officer Coleman claimed that when he turned his car around to pursue the shooters, he saw a man lying on the street saying, "These mother f*****s shot me," Dorsey unequivocally testified

that he did not realize that he had been shot until he entered his home and saw that he was bleeding. In light of these inconsistencies, it is in the very least arguable that evidence of a pattern of misconduct impeaching Officer Coleman's credibility could have led to an acquittal on the attempted murder charge.

¶ 58    The likelihood of a different trial result is even more glaring with respect to the aggravated assault against a peace officer charge. Apart from Officer Coleman's statement that he saw Reese pointing a gun at him from inside the Buick on the corner of Van Buren Street and Oakley Avenue, there was not an iota of circumstantial evidence to support this claim. Where the 2016 Chicago Tribune article notes that one of the complaints against Officer Coleman was an allegation of improper use of a weapon and shooting at a fleeing suspect, it is arguable that the introduction of the officer's pattern of misconduct could have led the trier of fact to conclude that the officer lied about seeing Reese pointing a gun at him to justify having fired ten shots into the Buick without provocation.

¶ 59    Therefore, evidence of Officer Coleman's pattern of misconduct and his indictment on the federal obstruction of justice charge arguably placed the trial evidence in a different light and undermined the court's confidence in the judgment of guilt. Accordingly, the petitioner made an arguable claim of actual innocence and the summary dismissal of his *pro se* postconviction petition was improper.

¶ 60                                    III. CONCLUSION

¶ 61    For the aforementioned reasons, we reverse the judgment of the circuit court and remand for further proceedings under the Act.

¶ 62    Reversed and remanded.