2021 IL App (1st) 192049-U

No. 1-19-2049

Order filed December 22, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 09 CR 15961 |
| | ) | |
| HAKEEM REDMOND, | ) | Honorable |
| | ) | William C. Gamboney, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the circuit court's first-stage dismissal of defendant's postconviction
petition where he failed to set forth arguable claims of actual innocence, ineffective
assistance of trial counsel and ineffective assistance of appellate counsel.

¶ 2     Following a jury trial, defendant Hakeem Redmond was convicted of first-degree murder

and sentenced to 50 years' imprisonment. After exhausting his direct appeal rights, defendant filed

a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)),

raising, in part, claims of actual innocence, ineffective assistance of trial counsel and ineffective

assistance of appellate counsel. The circuit court dismissed his petition at the first stage of proceedings under the Act, finding that his petition was frivolous and patently without merit. Defendant now appeals the court's dismissal and contends that he set forth arguable claims of: (1) actual innocence based on an affidavit from a newly discovered witness; (2) ineffective assistance of trial counsel for failing to investigate and present evidence of past misconduct by various police officers involved in his case; and (3) ineffective assistance of appellate counsel for failing to raise on direct appeal an argument that trial counsel was ineffective for failing to investigate and discover three exonerating eyewitnesses. For the reasons that follow, we affirm the circuit court's dismissal.

¶ 3                                I. BACKGROUND

¶ 4      In July 2009, Tyrone Bennett was found dead in a vacant lot with a gunshot wound to his head. A grand jury indicted defendant with multiple counts of first-degree murder for Bennett's death.

¶ 5                                   A. Trial

¶ 6      The following recitation from defendant's July 2014 trial comes directly from the Rule 23 order that disposed of his direct appeal. See *People v. Redmond*, 2018 IL App (1st) 151308-U.

> "In the State's case, Saquan Toney, a two-time convicted felon and admitted
> member of the Traveling Vice Lords, and Darryl Porter, a three-time convicted
> felon and admitted former member of the Traveling Vice Lords, testified. Toney
> and Porter both knew defendant from high school, but only Toney identified him
> as a member of the Unknown Vice Lords. Porter did not know if defendant
> belonged to a gang.

According to Toney, the Traveling Vice Lords and the Unknown Vice Lords had a presence in the area around the Eisenhower Expressway and the Central Park Avenue bridge that spanned over the expressway. On the north side of the expressway was the territory of a faction of Unknown Vice Lords, and on the south side of the expressway was the territory of the Traveling Vice Lords and another faction of Unknown Vice Lords. In July 2009, there was 'tension' between the faction of Unknown Vice Lords north of the expressway and the Traveling Vice Lords, stemming from members of both gangs 'flash[ing]' money they obtained from selling drugs at each other. One night, the Unknown Vice Lords came into the territory of the Traveling Vice Lords and sprayed champagne on members of the Traveling Vice Lords. A 'big fight' erupted later in the night, which prompted the Unknown Vice Lords to come back into the territory of the Traveling Vice Lords and shoot at them. The Traveling Vice Lords and apparently members of the faction of Unknown Vice Lords south of the expressway retaliated by shooting at members of the faction of Unknown Vice Lords north of the expressway. At trial, on cross-examination, Toney admitted that he was only present for the fight.

On July 21, 2009, Toney was selling heroin on West Lexington Street just to the east of South Central Park Avenue with Porter and 'Joe Blow,' a member of the Unknown Vice Lords. Porter and Joe Blow were acting as lookouts. Toney's drugs were located behind a house in an alley between West Flournoy Street and West Lexington Street. While Toney was selling heroin, he was also keeping an eye out for a red van. By 5 p.m. that day, Tyrone Bennett had joined Porter on the

corner of South Central Park Avenue and West Lexington Street, though no one considered Bennett to be an active member of the Traveling Vice Lords.

At some point within the next hour, Toney observed a red van driving north on South St. Louis Avenue, a street just to the east of where Tony was selling heroin. But he ignored the van because around the same time, two people came up to him looking to buy heroin. Toney walked into the alley to retrieve the heroin where he again observed the red van, this time driving slowly. Toney was about 15 feet away from the van and recognized the front passenger as defendant. Seconds later, Toney ran. As he was running, he called Porter on a walkie-talkie and told him to run, too. But Porter could not understand Toney, so Porter and Bennett remained on the corner. As Toney attempted to again tell Porter to run, Porter heard gunshots and began to run with Bennett by his side. Toney continued to run and heard 8 to 10 gunshots, though he never saw the shooter. While Porter and Bennett were running, they both fell down in a vacant lot. Porter got up and continued running, but lost track of Bennett.

Multiple other witnesses observed the shooting. James Williams was in the alley between West Flournoy Street and West Lexington Street throwing away grass clippings in a garbage can when he observed a red van and defendant exit the van. Defendant began talking to someone standing in the alley. That person walked away from defendant and shortly thereafter, defendant began shooting in the direction of the person who walked away. But because of garages blocking his view and taking cover in the alley, Williams could not see exactly at whom defendant was shooting. Defendant walked back toward the van, looked directly at Williams

from about three or four feet away, and entered the van, which then drove away through the alley.

Vanessa Beene and Basia Brayboy were at Brayboy's house located on South Central Park Avenue between West Flournoy Street and West Lexington Street. Behind Brayboy's house was a garage that abutted the alley. Beene and Brayboy decided to get ice cream, and as the two were walking down the stairs from the second floor to the first floor in an enclosure in the back of the house, Brayboy observed a red van speeding through the alley behind her house. The van stopped, three people wearing hoodies exited and ran down the alley. Suddenly, both Brayboy and Beene heard several gunshots. Beene looked out a window and observed a Black male holding a firearm. Though she was not able to see the face of the man with the firearm, she observed the man enter the passenger's side of a red van, which then sped away. Both Brayboy and Beene later discussed what they had seen with the police.

Larry Spears, who lived on West Flournoy Street between Central Park Avenue and South St. Louis Avenue, was grilling in his backyard when he heard gunshots. He immediately ran into his house and looked out of a window that faced the alley between West Flournoy Street and West Lexington Street. In the alley, approximately 50 feet away, Spears observed a parked red van with the passenger door open. A man jumped into the passenger side and shut the door, and the van proceeded to drive toward Spears' house at which point he observed the front passenger was defendant. Spears subsequently called the police and reported what he had seen.

The police arrived on the scene shortly thereafter. Bennett was found dead in a vacant lot at the corner of West Lexington Street and South Central Park Avenue. He died as a result of a single gunshot wound to the head, and the bullet was recovered. Based on information Detective Ericilio Ruiz learned at the scene, he sought out and spoke to Porter, who agreed to come back to the police station. There, Porter told Detective Ruiz that he observed defendant fire a handgun three or four times in his and Bennett's direction. Based on this identification, defendant became a suspect in the shooting, and Detective Ruiz created a photo array, which included defendant's photograph. Porter viewed the photo array and circled defendant's photograph, identifying him as the shooter.

Around this time, the police located a red van in a vacant lot that matched the description of the vehicle involved in the shooting. The van had been reported stolen earlier in the day. Officer Maurice Henderson processed the van for evidence and recovered a fired bullet as well as five fingerprints on the exterior of the vehicle, but none in the interior. He also took various swabs in the van for DNA analysis. Over the course of the next week, the police as well as assistant State's Attorneys interviewed the various witnesses.

On July 22, Spears viewed a photo array and identified defendant as the person he observed enter the red van. Four days later, Toney viewed a photo array and identified defendant as the person he saw in the front passenger seat of the red van. On July 29, Brayboy and Williams separately viewed a photo array and both identified defendant as the shooter. The following day, Detective Michael Corlett learned that defendant was in custody on an unrelated matter, prompting the police

to bring back the various witnesses that night to view a lineup. Spears, Williams, Toney and Brayboy went to the police station, separately viewed a lineup, and they all identified defendant: Spears and Toney as the person they observed in the van, and Williams and Brayboy as the shooter. Beene viewed the lineup, but could not identify anyone.

On July 31, Brayboy met with assistant State's Attorney Theresa Smith-Conyers and gave a written statement about the shooting. In the statement, Brayboy asserted that defendant was one of the individuals who exited the red van and he had shot a firearm in the alley. Brayboy told Smith-Conyers that she was afraid to get involved and reluctant to speak to the police. That same day, Porter met with assistant State's Attorney Phyllis Warren, but he declined to give a written statement. According to Warren, Porter did tell her that defendant fired a handgun three or four times in his and Bennett's direction and that he had seen a red van both before and after the shooting.

The following week, Brayboy met with assistant State's Attorney Jodi Peterson in anticipation of providing grand jury testimony. Brayboy told Peterson that her July 31 written statement contained several inaccuracies and she would not testify to untrue statements. Brayboy stated that she did not actually observe the shooter's face and only identified defendant as the shooter because she had been threatened by Detective Greg Swiderek. Peterson convened a meeting with Brayboy, Brayboy's mother, two other assistant State's Attorneys and Swiderek. At the meeting, assistant State's Attorney Peterson asked Brayboy to explain how Detective Swiderek had threatened her. Brayboy could not give specifics, which

prompted Peterson to continue to ask for details. Brayboy became agitated and did not provide any specific examples. She did remark that she felt like she could not leave the police station until she identified defendant as the shooter. Brayboy ultimately did not testify before a grand jury.

On August 12, Porter appeared before a grand jury and testified that he observed a red van and shortly thereafter, observed defendant emerge from an alley holding a firearm. Porter then heard three gunshots. Although Porter did not actually see defendant shoot the firearm because he was trying to run away, he was certain defendant had done so.

Later during the investigation, forensic scientist Michael Cox compared the fingerprints recovered in the red van to a known sample of defendant, but none matched. Forensic scientists Michele Bybee and Lisa Kell analyzed the DNA swabs taken from the red van, which resulted in mixed profiles being found. Defendant's DNA was compared to the mixed profiles, but he was excluded as contributing to them. Firearms analyst Angela Horn examined the two bullets recovered during the investigation, one from Bennett's head and one from the van, and determined that they had been discharged from different firearms. However, she could not identify which firearms because none had been recovered in connection with the case.

At trial, Porter told a narrative of events that conflicted with the testimony of the State's other witnesses and his statements shortly after the shooting. Most notably, he testified that he never saw defendant shoot a firearm or even observed him at the time of the shooting. On the night of the shooting, Porter recalled being brought to the police station involuntarily in handcuffs. He acknowledged that he

told the police that he had seen a red van driving near the time of the shooting and acknowledged circling defendant's photograph in a photo array. However, Porter explained that he only circled defendant's photograph because he knew defendant, not because defendant was the shooter. Porter also testified that he told assistant State's Attorney Warren that defendant was not the shooter and that the police had threatened to pin drug charges on him if he did not cooperate. Porter added that he told Warren he only circled defendant's photograph in the photo array because he knew him. Porter further denied at trial that he implicated defendant as the shooter in his grand jury testimony.

At trial, Sergeant Ruiz, having been promoted from detective, denied that he had handcuffed Porter, taken him to the police station involuntarily or threatened him. Warren denied being told by Porter that he only circled defendant's photograph in the photo array because he knew him, and she asserted that Porter told her that defendant was the shooter. Warren also testified that Porter told her the police had treated him well and he not received any threats to cooperate. Additionally, assistant State's Attorney Peterson, who presented Porter to the grand jury, testified that he never told her in their interview beforehand that he had been threatened.

Brayboy also told a narrative of events at trial that conflicted with the testimony of the State's other witnesses and her statements shortly after the shooting. Brayboy testified that her July 31 statement was littered with inaccuracies, and although she acknowledged hearing the gunshots, she denied ever seeing the face of the person who fired them. Though she admitted to selecting

defendant in both a photo array and lineup, she explained that she only selected him in the photo array because Detective Corlett told her to pick the person whose skin complexion most resembled that of the person she observed in the alley and only selected defendant again in the lineup because that was whom she selected in the photo array. Brayboy further testified that she informed the assistant State's Attorneys that Detective Swiderek had threatened her into identifying defendant as the shooter.

At trial, Detective Swiderek denied ever threatening Brayboy into identifying defendant. Assistant State's Attorney Smith-Conyers also testified that, at no point during her interview with Brayboy on July 31, did she complain about her treatment from the police. Smith-Conyers added that Brayboy never told her she selected defendant in the photo array or lineup simply due to his skin complexion most resembling that of the person she observed in the alley.

Defendant did not testify or present any other evidence on his behalf."

¶ 7    Following closing arguments, the jury found defendant guilty of first-degree murder and found that he was armed with a firearm during the commission of the offense.

¶ 8                                B. Posttrial

¶ 9    The following recitation from defendant's posttrial proceedings also comes directly from the Rule 23 order that disposed of his direct appeal. See *Redmond*, 2018 IL App (1st) 151308-U.

"Defendant, through his trial counsel, filed a motion for new trial. Thereafter, the trial court granted his counsel leave to withdraw, and he was replaced with another attorney. Over the course of the next several months, defendant's new attorney filed multiple supplemental motions for new trial.

Through the various motions, defendant argued that the State committed misconduct during its opening statement and closing argument with its repeated references to gang warfare, which unfairly inflamed the passions of the jury. Defendant also argued that his trial counsel had been ineffective for failing to interview Dwayne Combs, whom defendant allegedly told counsel about 'prior to trial,' and had counsel interviewed Dwayne, information from that interview would have led counsel to two additional witnesses, Darius Combs and Larry Matthews. Defendant posited that all three men would have testified that he was not the shooter. Additionally, defendant argued that his trial counsel was ineffective for failing to argue that he had no motive for the shooting where he had not been implicated in any of the rising tensions between the rival gangs.

At a hearing on defendant's motions for new trial, Dwayne, Darius and Matthews all testified. All three of the men testified that they knew defendant from high school and asserted that they were present at the time of the shooting. They observed the shooter, but were adamant that defendant was not the shooter or present at the time of the shooting. Despite this knowledge, they all acknowledged not telling defendant's trial counsel and not telling the police because they feared they would be harassed by them. Dwayne did not come forward until after defendant's trial, but decided to because he knew defendant was innocent. Darius stated that he told his mother what he knew about defendant not being the shooter, but never told the authorities until after defendant's trial. Matthews also admitted coming forward only after defendant's trial and acknowledged being in Cook

County Jail at the same time as defendant. But Matthews asserted that he did not tell defendant what he knew, and they never talked about the shooting.

Defendant also testified at the hearing, stating that he only learned after his trial that Dwayne, Darius and Matthews were present at the time of the shooting, though he knew Dwayne was often outside in the area where the shooting occurred. Because before his trial, 'a lot of people out there [were] saying that [he] didn't do' the shooting, defendant told his trial counsel that he should send an investigator to speak with Dwayne because he was always hanging around the area where the shooting occurred and might know something. Defendant testified that he specifically gave his trial counsel Dwayne's name, though he did not have any of Dwayne's contact information. According to defendant, counsel said he would send an investigator to the area to find Dwayne.

Lastly, Mark Kusatzky, defendant's trial counsel, testified and denied that, either before or after trial, defendant ever asked him to locate Dwayne, Darius or Matthews. Kusatzky added that he had never heard Dwayne's name before.

After argument, the trial court denied defendant's motions for new trial, noting that Dwayne, Darius and Matthews only came forward after trial, but more generally that it thought they were 'wholly incredible.' Concerning defendant, the court stated that it did not 'believe a single word he said about' his trial counsel's actions, specifically about being forced into a jury trial and not testifying, which were other claims defendant had made in his motions for new trial. On the whole, the court noted that trial counsel's performance was 'excellent' and 'far from

ineffective,' and counsel 'clearly overwhelmingly went beyond the standards set forth in the *Strickland* matter.' "

¶ 10 The case proceeded to sentencing, where, in April 2015, the trial court sentenced defendant to 35 years' imprisonment for first-degree murder and an additional 15 years' imprisonment as a firearm enhancement for a total of 50 years' imprisonment. Defendant timely appealed.

¶ 11                                    C. Direct Appeal

¶ 12 On direct appeal, defendant first contended that his right to a fair trial was violated when the State presented inadmissible and irrelevant gang evidence, which was further amplified by the State's comments during its opening statement and closing argument that the murder of Bennett was the result of gang warfare. We found that the State presented admissible and relevant gang evidence and the State did not make an improper opening statement or closing argument. Defendant next contended that his trial counsel provided ineffective assistance in a multitude of ways. First, defendant argued that counsel failed to object to portions of Toney's testimony on hearsay grounds. Second, defendant argued that counsel failed to move for a mistrial once the State's reasons for introducing the gang evidence unraveled during trial and where the State unfairly prejudiced him during its opening statement and closing argument. We found that Toney did not testify to inadmissible hearsay, and therefore, counsel did not provide ineffective assistance by failing to object. Additionally, because the gang evidence was properly admitted and the State did not make any improper remarks during its opening statement or closing argument, we concluded that counsel did not perform deficiently by failing to move for a mistrial.

¶ 13 Lastly, defendant contended that the trial court erred in denying his motions for new trial where the newly discovered evidence—eyewitnesses Dwayne, Darius and Matthews— contradicted the State's witnesses who identified him as the shooter and supported Porter's trial

testimony that he was not the shooter. We highlighted that defendant did not make this claim in his posttrial motions, but rather argued that his trial counsel was ineffective for failing to interview Dwayne before trial, who then would have led counsel to Darius and Matthews. As such, we found defendant could not raise this argument for the first time on appeal. In light of defendant's contentions of error having no merit, we affirmed his conviction in December 2018. Three and a half months later, our supreme court denied defendant's petition for leave to appeal.

¶ 14                    D. Postconviction Proceedings

¶ 15    In June 2019, defendant filed a *pro se* petition under the Act (725 ILCS 5/122-1 *et seq.* (West 2018)), raising several claims of error.

¶ 16                    1. Kenneth Mason Evidence

¶ 17    As relevant to this appeal, defendant claimed that his trial counsel provided ineffective assistance by failing to interview the State's witnesses in anticipation of trial. According to defendant, had counsel interviewed Porter, counsel would have discovered that Kenneth Mason was on the scene at the time of the shooting. Once counsel found Mason, defendant stated that counsel would have "discovered [his] innocence and the actual shooter" and thus, supported Porter and Brayboy's claims at trial that he was not the shooter. To this end, defendant stated that he "files a claim of actual innocence under newly discovered evidence and ineffective counsel."

¶ 18    In support of this claim, defendant attached a portion of the trial transcript where Porter testified that a man named "Kenneth," among other people, were "out there working selling drugs" at the time of Bennett's murder. Defendant also attached an affidavit from his sister, Tamika Jones, who averred that she ran into Mason after defendant had been convicted of murder. Mason asked Jones about defendant, unaware that he had been convicted of murder. Mason told Jones that "he was out on the block" when Bennett was killed and observed the face of the shooter, who was not

defendant. Mason also provided an affidavit and averred that he was at the scene when Bennett was shot and killed. While he was there "hanging out," he observed a "familiar face" running out of an alley next to a vehicle and shooting into the crowd. Before Mason could run away from the shooting, he got "a good look at the face of the shooter," and the person was not defendant, but rather a man named Y.M.[1] Mason had known defendant for many years and could "easily" identify him if he saw him. After the shooting, Mason was "scared," "upset" and observed what he thought was the police "harassing people." Mason further described his encounter with Jones, which was when he learned that defendant had been convicted of Bennett's murder. After learning this, Mason was "shocked" because he was "out there the day when [Bennett] got killed" and "kn[e]w [defendant] had no involvement." Since Mason "kn[e]w [defendant] was innocent," he agreed to help Jones. Mason stated that he was willing to testify to the facts in his affidavit. Defendant additionally provided affidavits of his own, wherein he averred that he did not kill Bennett and that he was unaware Mason was at the scene of the crime until he heard Porter's trial testimony.

¶ 19                    2. Failure to Investigate Detectives

¶ 20    Additionally, defendant argued that his trial counsel provided ineffective assistance by failing to investigate and present evidence of the prior misconduct by the detectives involved in his case. Defendant highlighted that Porter and Brayboy claimed that they had been coerced by the police into identifying him as the shooter of Bennett and that the detectives involved in his case had "engaged in a pattern and practice of coercive behavior against [other] witnesses." According to defendant, had his trial counsel investigated the backgrounds of Detective Swiderek, Detective Corlett and Detective David Roberts and presented such evidence, counsel could have bolstered

---

[1] Although Mason identified the alleged shooter by name, because it is merely an allegation, we have used that person's initials only.

his defense and supported Porter and Brayboy's claims of coercion.[2] In support of this claim, defendant attached multiple exhibits to his petition purportedly showing the prior misconduct.

¶ 21    One exhibit was a printout from the Chicago Reporter's website indicating that Detective Swiderek had been named in four misconduct lawsuits—three for "false arrest" and one for "malicious prosecution"—that had settled for approximately $273,000 combined. Although there was a narrative of the incidents that led to the settlements, all but one of the narratives were cut off before listing any of the specific allegations. It appears that one would have to visit the Chicago Reporter's website and click "read more" to view the full narratives. The exception was the "malicious prosecution" settlement, where the website indicated that a man named Jamar Nixon "spent more than three years in jail after police forced him to confess to a 2004 murder he did not commit." However, there is no indication from any of the narratives, including Nixon's alleged false confession, what role Detective Swiderek played in the incidents leading to the settlements. Another exhibit was titled "Employee Complaint History from CRMS," and it listed nine complaints against Detective Swiderek from June 2001 until January 2013. The third exhibit was titled "Pre-2000 Mainframe Complaint Register History," and it listed 10 complaints against Detective Swiderek from October 1991 until July 1998.

¶ 22    Defendant attached similar exhibits about Sergeant Corlett, who apparently had been promoted from detective. One exhibit was from the Chicago Reporter's website that indicated he had been named in two misconduct lawsuits, both for "false arrest," that had settled for approximately $103,000 combined. Two other exhibits listed 16 complaints lobbied against him from September 1995 until May 2017. Like with Detective Swiderek, although there was a

___

[2] Detective Roberts was a partner of Detective Swiderek and then-Detective Corlett. Detective Roberts was responsible for conducting the lineups with various witnesses in the case, including Brayboy.

narrative of the incidents leading to the settlements, the narratives were cut off before listing any of the specific allegations and the narratives did not indicate what role Sergeant Corlett played in the incidents. Defendant attached the same exhibits about Detective Roberts, including an exhibit from the Chicago Reporter's website indicating that he had been named in one misconduct lawsuit for "false arrest" that had settled for approximately $99,000 and exhibits listing 22 complaints lobbied against him from November 1995 until July 2017. Like with Detective Swiderek and Sergeant Corlett, although there was a narrative of the incident leading to the settlement, the narrative was cut off before listing any of the specific allegations and the narrative did not indicate what role Detective Roberts played in the incident.

¶ 23    For all of the misconduct allegations against Detective Swiderek, Sergeant Corlett and Detective Roberts listed in the complaint histories, these exhibits only contained generic complaint categories such as "neglect of duty," "arrestee – during arrest" or "search of premises/vehicle w/o warrant." The lists also included the date of the incident, the date the complaint was filed, the date when the investigation of the complaint was closed and the final finding as a result of the investigation with abbreviations of "NS," "EX," "SU," "UN" and "NA." According to the Chicago Police Department's website, specifically its page related to the internal investigative process for allegations of misconduct, the first four abbreviations were apparently short for "not sustained," "exonerated," "sustained" and "unfounded."[3] Only two of the 57 allegations of misconduct against Detective Swiderek, Sergeant Corlett and Detective Roberts resulted in final findings of sustained. Both were against Detective Roberts, one based on an incident in June 2005 that contained a

---

[3] We may take judicial notice of information published on the Chicago Police Department's website, even where that information was not presented in the circuit court. See *Lesner v. Police Board of City of Chicago*, 2016 IL App (1st) 150545, ¶ 33.

complaint category of "excessive force – off duty" and the other based on an incident in November 1995 that contained a complaint category of "inadequate/fail to provide service."

¶ 24                                    3. Appellate Counsel Ineffectiveness

¶ 25    Defendant also claimed that his appellate counsel provided ineffective assistance in multiple manners. For one, defendant posited that appellate counsel "was ineffective for her failure to argue [posttrial counsel] was ineffective for not arguing that" Dwayne, Darius and Matthews "were newly discovered witnesses" who were likely to change the result of the trial. In addition, defendant posited that appellate counsel was ineffective for "mis-framing the argument that the trial court was employing the *Molstad* standard as part of the *Strickland* evaluation of [trial counsel's] performance."

¶ 26    Defendant supported this claim with his own affidavit, wherein he averred that, before his trial, he told his trial counsel to try and locate an individual named "Dewayne [*sic*] Combs" and generally investigate "the crime scene by questioning people" because "people" were saying that he was innocent. Defendant stated that he told his trial counsel that Dwayne hung out and lived near the scene of the shooting. Additionally, defendant attached a correspondence between him and his appellate counsel, where she discussed the term "forfeiture," as mentioned in the appellate court decision. Appellate counsel also explained to defendant why she proceeded in the manner she did on appeal with respect to the arguments related to Dwayne, Darius and Matthews. Appellate counsel explained that, based on her reading of the record, the attorneys and the trial court agreed that the three witnesses were newly discovered, and therefore, she argued that the trial court employed a standard of review for claims of a new trial based on newly discovered evidence "as part of the *Strickland* evaluation of [trial counsel's] performance." Appellate counsel

remarked that the appellate court did not agree with her interpretation of the record and found the argument forfeited.

¶ 27                                    4. Circuit Court's Ruling

¶ 28    After reviewing defendant's postconviction petition, the circuit court concluded in a written order that his petition set forth no claims that were arguable in law or in fact, and therefore, the petition was frivolous and patently without merit. Concerning defendant's actual innocence claim, the court observed that the claim was not freestanding because Mason's affidavit also supported a claim of ineffective assistance of trial counsel. Regardless, the court found that Mason's potential testimony was not of such a conclusive character that it would probably change the result of a retrial. Concerning defendant's claim of ineffective assistance of trial counsel for failing to investigate and present evidence of the prior misconduct by Detective Swiderek, Detective Roberts and Sergeant Corlett, the court found defendant's evidence too dissimilar to the allegations of Brayboy and Porter to have been admissible. The court added that, even if the evidence was admissible, because of the dissimilarity, the probative value of the evidence would have been negligible and would not have materially helped defendant's case. As such, the court concluded that defendant could not demonstrate arguable prejudice from counsel's allegedly deficient performance. Lastly, concerning defendant's claim of ineffective assistance of appellate counsel, the court found that, during the hearing on defendant's posttrial motions, the court found Dwayne, Darius and Matthews incredible. As such, the court found appellate counsel would not have been able to successfully argue trial counsel's ineffectiveness on direct appeal, and thus, defendant could not show he was arguably prejudiced by appellate counsel's actions. Consequently, the circuit court dismissed defendant's postconviction petition.

¶ 29    Thereafter, defendant appealed the circuit court's dismissal of his postconviction petition.

¶ 30                                   II. ANALYSIS

¶ 31    Defendant contends that the circuit court improperly dismissed his postconviction petition as frivolous and patently without merit where his petition set forth arguable claims of: (1) actual innocence based on Mason's affidavit; (2) ineffective assistance of trial counsel for failing to investigate and present evidence of the prior misconduct by Detective Swiderek, Detective Roberts and Sergeant Corlett; and (3) ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness for failing to investigate and discover exonerating eyewitnesses Dwayne, Darius and Matthews.

¶ 32                          A. Postconviction Proceedings

¶ 33    The Act provides a three-stage process for defendants who allege that they have suffered a substantial deprivation of their constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. This appeal only concerns the first stage, as this is the stage where the circuit court dismissed defendant's petition. At the first stage of proceedings under the Act, after the defendant files a petition, the circuit court must determine whether the petition states the gist of a constitutional claim, or is frivolous or patently without merit. *People v. Bailey*, 2017 IL 121450, ¶ 18; see also 725 ILCS 5/122-2.1(a)(2) (West 2018). At this stage, the court acts " 'strictly in an administrative capacity by screening out those petitions which are without legal substance or are obviously without merit.' " *People v. Tate*, 2012 IL 112214, ¶ 9 (quoting *People v. Rivera*, 198 Ill. 2d 364, 373 (2001)). Because of this administrative role, the court is not permitted to make any credibility determinations or engage in any fact-finding endeavors. *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). The petition's allegations of fact must be accepted as true as long as they are not affirmatively rebutted by the record. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47.

¶ 34    A petition may be deemed frivolous or patently without merit only where it has no arguable basis in either law or fact, meaning the petition relies "on 'an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)). At the first stage of proceedings, a *pro se* petition should be construed liberally, meaning a "borderline" petition should be allowed to proceed. *Thomas*, 2014 IL App (2d) 121001, ¶ 48. We review the circuit court's first-stage dismissal *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 35                                    B. Actual Innocence

¶ 36    Defendant first argues that his postconviction petition set forth an arguable claim of actual innocence based on the newly discovered affidavit from Mason, who would testify that Y.M., not defendant, was the shooter.

¶ 37    In order for a defendant to establish a claim of actual innocence, his "supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is considered newly discovered where it was uncovered after trial and the defendant could not have uncovered it earlier using due diligence. *Id.* Evidence is considered material where it is relevant and probative of the defendant's innocence. *Id.* Evidence is considered noncumulative where it supplements the evidence the trial court or jury heard during trial. *Id.* And lastly, evidence is considered of such a conclusive character where the newly discovered evidence, in conjunction with the trial evidence, would likely lead to a different trial result. *Id.* The last element is the most important of them all. *Id.* "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. The newly discovered evidence does not need to

"be entirely dispositive to be likely to alter the result on retrial." *Id.* Instead, "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 38    Although the circuit court found that Mason's affidavit was not of such a conclusive character that it would probably change the result on retrial, the court also found that defendant's actual innocence claim was not freestanding because Mason's affidavit also supported an ineffective assistance of trial counsel claim. See *People v. Hobley*, 182 Ill. 2d 404, 443-444 (1998) (discussing freestanding actual innocence claims). Because we agree with the court that Mason's affidavit is not of such a conclusive character that it would probably change the result on retrial, we need not discuss whether defendant's actual innocence claim was freestanding or whether such a requirement is consistent with our supreme court's recent jurisprudence on actual innocence claims. See *People v. Martinez*, 2021 IL App (1st) 190490, ¶¶ 102-106.

¶ 39    In Mason's affidavit, he averred that, while he was at the scene where Bennett was killed, he observed a "familiar face" running out of an alley next to a vehicle and shooting into a crowd. Before Mason could run away from the shooting, he got "a good look at the face of the shooter," and the person was not defendant, but rather Y.M. Additionally, Mason claimed that he knew defendant was not involved and was innocent. As the circuit court observed in its written order dismissing defendant's petition, Mason's averments merely indicate that Y.M., not defendant, was the individual *he* observed shooting. But Mason's statements do exclude defendant from participating in the shooting. As revealed during defendant's trial, the forensic evidence indicated that at least two firearms were fired during the commission of the crime, and both Brayboy and Beene testified that three people emerged from the red van. Furthermore, Williams identified defendant as exiting the red van and shooting a firearm, and Spears identified defendant as the

front passenger of the red van. Although Mason asserted that defendant was not involved and was innocent, Mason never explained in his affidavit how he knew defendant was not involved and was innocent beyond stating that Y.M. was the individual *he* observed shooting. Because there were multiple individuals who jumped out of the red van and multiple firearms involved, Mason's averments that defendant was innocent and not involved was a conclusory assertion. See *People v. Morris*, 236 Ill. 2d 345, 354 (2010) ("[A] petition alleging nonfactual and nonspecific assertions that merely amount to conclusions will not survive summary dismissal under the Act.").

¶ 40 Because multiple individuals and firearms were involved in the crime and multiple other witnesses identified him as being involved, Mason's affidavit does not place the evidence at trial in a different light and undermine our confidence in defendant's conviction. See *Robinson*, 2020 IL 123849, ¶ 48. This holds true even discounting the identifications made by Porter and Brayboy of defendant as the shooter to the police, which they alleged were coerced. Although defendant posits that Mason's affidavit must be taken into consideration along with the exculpatory testimony from Dwayne, Darius and Matthews, "the conclusive character element refers to evidence that, when considered along *with the trial evidence*, would probably lead to a different result." (Emphasis added). *Id.* ¶ 47. Dwayne, Darius and Matthews did not testify at trial, and therefore, they are not part of the trial evidence. Moreover, during the hearing on defendant's posttrial motions, the trial court found the testimony of Dwayne, Darius and Matthews to be "wholly incredible." Because Mason's affidavit is not of such a conclusive character that it would probably change the result on retrial, defendant's actual innocence claim fails. See *id.*

¶ 41 Defendant further posits that the circuit court employed an incorrect standard when determining whether Mason's affidavit would probably change the result on retrial. In its written order, the court stated that "[t]he hallmark of actual innocence means total vindication or

exoneration" and cited *People v. Evans*, 2017 IL App (1st) 143268, ¶ 30. In *Robinson*, 2020 IL 123849, ¶ 55, our supreme court noted that "the total vindication or exoneration standard" had been specifically rejected by the court in *People v. Savory*, 197 Ill. 2d 203, 213 (2001). However, because we review first-stage dismissals *de novo* and have not employed "the total vindication or exoneration standard," it is irrelevant if the circuit court utilized this standard. And nevertheless, the circuit court came to the correct ultimate conclusion on defendant's actual innocence claim.

¶ 42                    C. Ineffective Assistance of Trial Counsel

¶ 43    Defendant next argues that his postconviction petition set forth an arguable claim that his trial counsel was ineffective for failing to investigate and present evidence of misconduct by Detective Swiderek, Detective Roberts and Sergeant Corlett. Defendant posits that, had counsel uncovered this information, counsel could have used the information to impeach their credibility and to establish a pattern and practice of witness coercion to bolster the testimony of Porter and Brayboy.

¶ 44    To establish that trial counsel was ineffective, the defendant must satisfy the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Domagala*, 2013 IL 113688, ¶ 36. Under this standard, he must show that his counsel's performance was deficient and the deficiency prejudiced him. *Id.* Specific to the first stage of the Act, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced" (*Hodges*, 234 Ill. 2d at 17), *i.e.*, it is arguable that the result of the proceeding would have been different but for counsel's performance. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 79. Both elements of the *Strickland* test must be met, and we may analyze them in any order. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 109.

¶ 45    Generally, the decision about what evidence to present is a strategic one. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. But "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). To this end, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. And "strategic decisions may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-04 (1993) (quoting *Strickland*, 466 U.S. at 690). Allegations of prior misconduct by a police officer may be admissible at trial "to prove intent, plan, motive, or a course of conduct of the officer [citations] or to impeach an officer as a witness based on bias, interest, or motive to testify falsely." *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 11. Whether trial counsel was ineffective for failing to investigate is generally determined by comparing the strength of the trial evidence with the value of the evidence allegedly not presented at trial. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 24.

¶ 46    Initially, we note that there is no evidence that trial counsel failed to investigate the backgrounds of the officers. But assuming *arguendo* that counsel did unreasonably fail to do so, this failure did not arguably prejudice defendant. Regarding the settlements involving Detective Swiderek from the Chicago Reporter's website, three of the settlements included narratives that were cut off before detailing the specific allegations, and they were all for "false arrest." The other narrative indicated that a man named Jamar Nixon spent more than three years in jail "after police forced him to confess to a 2004 murder he did not commit." But, as discussed, there is no indication from this description what role Detective Swiderek played in Nixon's alleged false confession.

¶ 47    While allegations of false arrests are certainly serious matters, such allegations are unrelated to what Porter and Brayboy have alleged in this case, namely threatening witnesses to

identify an innocent defendant. See *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17 (for evidence of prior misconduct by a police officer to be admissible as impeaching evidence, there must be a sufficient temporal proximity, "a repetition of similar misconduct, and the similarity of the past misconduct to the conduct at issue"). Given the dissimilarity between the allegations from the "false arrest" settlements involving Detective Swiderek on the Chicago Reporter's website and what Porter and Brayboy have alleged in this case, it is quite possible, if not likely, that the trial court would have barred defendant from using this evidence for impeachment. See *id.* ¶ 22.

¶ 48 The settlement involving Nixon, in which officers allegedly forced him to confess to a crime he did not commit, certainly is similar to what Porter and Brayboy have alleged. Although it is similar, the Nixon settlement narrative did not include any specific allegations against Detective Swiderek, leaving complete uncertainty as to his role in the alleged incident. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). The same holds true for the false arrest settlement narratives involving Detective Swiderek, where we have no idea what role he played in the alleged incidents. Additionally, while the Chicago Reporter's website indicated that Detective Swiderek was involved in the four settlements, a settlement is not dispositive of liability or guilt. See *County of Cook v. Illinois Labor Relations Board*, 2012 IL App (1st) 111514, ¶ 32 ("[N]egotiations and settlements do not constitute an admission of guilt for any reason and are, therefore, irrelevant."). These same flaws exist with the exhibits from the Chicago Reporter's website about Detective Roberts and Sergeant Corlett. Given these issues with the exhibits from the Chicago Reporter's website, if they were even admissible, which is unlikely, they would not have materially helped defendant at trial.

¶ 49 Lastly, the complaint histories of Detective Swiderek, Detective Roberts and Sergeant Corlett have no specific allegations directed against them, and none of the complaint categories— such as "neglect of duty," "arrestee – during arrest" or "search of premises/vehicle w/o warrant"— involve any conduct similar to what has been alleged by Porter and Brayboy in this case. See *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17. Moreover, of the 57 complaints lobbied against Detective Swiderek, Detective Roberts and Sergeant Corlett, 55 of them resulted in findings of not sustained, exonerated, unfounded and "NA"—presumably not available—rendering them inadmissible as impeaching evidence. See *id.* ¶ 20 ("Mere allegations of misconduct, without evidence the officer was disciplined, are not admissible as impeachment."). Only two of the complaints resulted in final findings of sustained, both of which were against Detective Roberts: one based on an incident in June 2005 that contained a complaint category of "excessive force – off duty" and the other based on an incident in November 1995 that contained a complaint category of "inadequate/fail to provide service." None of these sustained allegations are remotely similar to what has been alleged by Porter and Brayboy in this case, making the sustained allegations likely inadmissible. See *id.* ¶ 17. But even if they were admissible, they would not have materially helped defendant at trial given their dissimilarity.

¶ 50 Because all of these exhibits might not have even been admissible at trial and even if they were, they would have had little value to defendant's case, it is not arguable that the result of his trial would have been different had trial counsel investigated and presented such evidence, regardless of the strength or weakness of the State's case. See *Clark*, 2011 IL App (2d) 100188, ¶ 24. Consequently, defendant's trial counsel was not arguably ineffective for failing to investigate and present this evidence.

¶ 51                     D. Ineffective Assistance of Appellate Counsel

¶ 52    Defendant lastly argues that his postconviction petition set forth an arguable claim that his appellate counsel was ineffective for failing to argue on direct appeal, consistent with posttrial counsel's argument during posttrial motions, that trial counsel was ineffective for failing to investigate and discover Dwayne, Darius and Matthews, three purported exonerating eyewitnesses.

¶ 53    As discussed, in defendant's motions for new trial, under the representation of different counsel than he had at trial, he posited that his trial counsel had been ineffective for failing to interview Dwayne, whom defendant allegedly told counsel about before trial. And according to defendant, had counsel interviewed Dwayne, information from that interview would have led counsel to Darius and Matthews, all three of which would have testified that he was not the shooter. Yet, on direct appeal, defendant contended that the trial court erred in denying his motions for new trial where the newly discovered evidence of Dwayne, Darius and Matthews, contradicted the State's witnesses who identified him as the shooter and supported Porter's trial testimony that defendant was not the shooter. Because defendant made different arguments in his motions for new trial than he did on direct appeal, we found he was precluded from raising his appellate claim for the first time on direct appeal. Given his forfeiture on direct appeal of his contentions related to Dwayne, Darius and Matthews, defendant now argues that his appellate counsel should have raised an argument on direct appeal about trial counsel being ineffective for failing to investigate and discover Dwayne, Darius and Matthews, which would have been consistent with the argument in his motions for new trial.

¶ 54    We analyze a claim of ineffective assistance of appellate counsel under the same standards as a claim of ineffective assistance of trial counsel. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). As such, to succeed on a claim of ineffective assistance of appellate counsel, defendant has to

establish that it is arguable his appellate counsel's performance fell below an objective standard of reasonableness and it is arguable that there is a reasonable probability that the result of his appeal would have been different absent appellate counsel's allegedly deficient performance. *Hodges*, 234 Ill. 2d at 17; *People v. Golden*, 229 Ill. 2d 277, 283 (2008). Stated otherwise, "to show prejudice, the defendant must show that the underlying issue had merit." *People v. Moore*, 402 Ill. App. 3d 143, 147 (2010).

¶ 55    In turn, we must examine the underlying issue of whether defendant's trial counsel was ineffective for failing to investigate and ultimately present Dwayne, Darius and Matthews as witnesses. For defendant to have prevailed on direct appeal with his ineffective assistance of trial counsel claim, he would have had to establish that (1) his counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, absent counsel's deficient performance, the result of his trial would have been different. *People v. Peterson*, 2017 IL 120331, ¶ 79. As we have already discussed, the decision about what evidence to present is a strategic one. *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. But "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *Morris*, 335 Ill. App. 3d at 79. To this end, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. But counsel is not required to be clairvoyant in order to be effective. *People v. Vasser*, 331 Ill. App. 3d 675, 685 (2002).

¶ 56    During the hearing on defendant's posttrial motions, trial counsel testified and denied that defendant ever asked him to locate Dwayne, Darius or Matthews. Counsel further explicitly asserted that he had never even heard Dwayne's name before. Although during the hearing, defendant claimed he told his trial counsel that he should send an investigator to speak with

Dwayne, the trial court found defendant's assertions incredible and remarked that it did not "believe a single word he said about" counsel's actions. The court further found that trial counsel's performance went well beyond the standards set forth in *Strickland*. Given that the trial court explicitly found defendant to be incredible and inherently found trial counsel to be credible, trial counsel cannot be faulted for not discovering witnesses who were completely unknown to him. See *People v. English*, 403 Ill. App. 3d 121, 137-38 (2010) (finding that the credible testimony of the defendant's trial counsel established that neither defendant nor his family alerted counsel to three purported alibi witnesses, and "because counsel was never apprised of these purported alibi witnesses by defendant, she was not ineffective for failing to investigate them or call them as witnesses"). Therefore, trial counsel's performance did not fall below an objective standard of reasonableness. As the underlying issue had no merit, defendant cannot show arguable prejudice from his appellate counsel's failure to argue on direct appeal consistent with his motions for new trial. See *Moore*, 402 Ill. App. 3d at 147. Consequently, defendant's appellate counsel was not arguably ineffective.

¶ 57                            III. CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59    Affirmed.